1  David E. Bower (SBN 119546)
2  **MONTEVERDE & ASSOCIATES PC**
   600 Corporate Pointe, Suite 1170
3  Culver City, CA 90230
   Tel: (213) 446-6652
4  Fax: (212) 202-7880

5  *Counsel for Lead Plaintiff and*
   *Lead Counsel for the Putative Class*

6

7  **UNITED STATES DISTRICT COURT**
   **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

8  TONY PLANT, Individually and on Behalf           Case No. 3:17-cv-04102-RS
9  of All Others Similarly Situated,

10                      Plaintiff,                    **MEMORANDUM OF POINTS AND**
                                                     **AUTHORITIES IN OPPOSITION TO**
11         v.                                         **DEFENDANTS' MOTION TO DISMISS**

12  JAGUAR ANIMAL HEALTH, INC.,                      Date:     June 14, 2018
    JAGUAR HEALTH, INC., JAMES J.                    Time:     1:30 p.m.
13  BOCHNOWSKI, LISA CONTE, JOHN                     Judge:    Hon. Richard Seeborg
    MICEK III, and ARI AZHIR,                        Place:    450 Golden Gate Avenue
14                                                             San Francisco, CA 94102
                        Defendants.                            Courtroom 3 – 17th Floor
15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**TABLE OF CONTENTS**

SUMMARY OF THE ACTION ................................................................................ 1

RELEVANT FACTUAL BACKGROUND ........................................................... 5

APPLICABLE LEGAL STANDARDS ................................................................. 7

    I.    The Motion to Dismiss Standard ............................................................ 7

    II.    The Elements of a Section 14(a)/Rule 14a-9 Claim and the Federal
        Materiality/Misleading Statement Standard .......................................... 8

ARGUMENT ........................................................................................................ 11

    I.    The Proxy Omitted Material Projections and Valuation Information, Rendering
        the Disclosed Financial Information Materially Incomplete and Misleading ...... 11

        A.    The Omission of the Cash Flow Projections and Pro Forma Projections
                Rendered the Projections on Pages 289-290 of the Proxy and the
                Summaries of Stifel's Contribution Margin Analysis and Discounted Cash
                Flow Analysis Incomplete and Misleading................................................ 13

                1.    The Cash Flow Projections…………...........................................13

                2.    The Pro Forma Projections.........................................................16

        B.    The Probabilities of Technical Success Rates .......................................... 17

        C.    The Individual Multiples Stifel Calculated in Connection With its Selected
                Companies and Transactions Analyses...................................................... 19

    II.    The Cases Relied Upon by Defendants Applied Different Standards or are
        Factually Distinguishable.......................................................................... 20

    III.    Plaintiff Has Adequately Pled Loss Causation ...................................... 22

    IV.    Plaintiff's Claims Are Direct, Not Derivative ....................................... 23

    V.    Plaintiff has Adequately Pled Defendants Violated Section 20(a) ....................... 25

CONCLUSION..................................................................................................... 25

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**TABLE OF AUTHORITIES**

**Cases**                                                                                      **Page(s)**

*Azar v. Blount Int'l, Inc.*,
    No. 3:16-cv-483-SI, 2017 U.S. Dist. LEXIS 39493 (D. Or. Mar. 20, 2017) ................ *passim*

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ........................................................................................................ 7, 8

*Biver v. Nicholas Fin., Inc.*,
    No. 8:14-cv-250-T-33TGW, 2014 U.S. Dist. LEXIS 73933 (M.D. Fla. May 30, 2014) ....... 25

*Bradshaw v. Jenkins*,
    No. C83-771R., 1984 U.S. Dist. LEXIS 24101 (W.D. Wash. Aug. 27 1984) ...................... 23

*Brody v. Transitional Hosps. Corp.*,
    280 F.3d 997 (9th Cir. 2002) ........................................................................................... 21

*Brown v. Brewer*,
    No. CV 06-3731-GHK (JTLx), 2008 U.S. Dist. LEXIS 108904 (C.D. Cal. July 14, 2008) .... 8

*Brown v. Brewer*,
    No. CV 06-3731-GHK (SHx), 2010 U.S. Dist. LEXIS 60863 (C.D. Cal. June 17, 2010) .. 3, 8

*Chi. Male Med. Clinic, L.L.C. v. Ultimate Mgmt.*,
    No.: EDCV 13-00199 SJO, 2014 U.S. Dist. LEXIS 174478 (C.D. Cal. Dec. 16, 2014) ....... 17

*City of Hialeah Emps. Ret. Sys. v. FEI Co.*,
    No. 3:16-cv-1792-SI, 2018 U.S. Dist. LEXIS 11989 (D. Or. Jan. 25, 2018) ........... 4-5, 20, 21

*City of St. Clair Shores Gen. Emps. Ret. Sys. v. Inland W. Retail Real Estate Tr., Inc.*,
    635 F. Supp. 2d 783 (N.D. Ill. 2009) .................................................................................. 25

*Eminence Capital, L.L.C. v. Aspeon, Inc.*,
    316 F.3d 1048 (9th Cir. 2003) .................................................................................... 25-26

*Fecht v. Price Co.*,
    70 F.3d 1078 (9th Cir. 1995) ............................................................................................ 10

*Folger Adam Co. v. PMI Indus., Inc.*,
    938 F.2d 1529 (2d Cir. 1991) ............................................................................................. 9

*Fresno County Emps. Ret. Ass'n v. comScore, Inc.*,
    No. 16-cv-01820 (JGK), 2017 U.S. Dist. LEXIS 119648 (S.D.N.Y. July 28, 2017) ............. 9

*Gentile v. Rossette*,
    906 A.2d 91 (Del. 2006) ................................................................................................... 24

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1    *Helwig v. Vencor, Inc.*,
2        251 F.3d 540 (6th Cir. 2001) ........................................................... 4

3    *In re Hot Topic Sec. Litig.*,
         No. CV 13-02939 SJO (JCx),
4        2014 U.S. Dist. LEXIS 180513 (C.D. Cal. May 2, 2014) ......................................... 21, 22, 25

5    *Hysong v. Encore Energy Partners LP*,
6        No. 11-781, 2011 U.S. Dist. LEXIS 130688 (D. Del. Nov. 10, 2011) ................................. 21

7    *J.I. Case Co. v. Borak*,
         377 U.S. 426 (1964) ........................................................... 23
8
     *Katz v. Pels*,
9        774 F. Supp. 121 (S.D.N.Y. 1991) ........................................................... 23

10   *Kaufman v. Tallant  (In re Tallant)*,
11       207 B.R. 923 (Bankr. E.D. Cal. 1997) ........................................................... 5

12   *Knievel v. ESPN*,
         393 F.3d 1068 (9th Cir. 2005) ........................................................... 8
13
     *Knollenberg v. Harmonic, Inc.*,
14       152 F. App'x 674 (9th Cir. 2005) ........................................................... 8

15   *Marx v. Comput. Scis. Corp.*,
16       507 F.2d 485 (9th Cir. 1974) ........................................................... 3

17   *In re Micromet, Inc. S'holders Litig.*,
18       No. 7197-VCP, 2012 Del. Ch. LEXIS 41 (Del. Ch. Feb. 29, 2012) .......................... 18

19   *Miller v. Thane Int'l, Inc.*,
         519 F.3d 879 (9th Cir. 2008) ........................................................... 4, 5
20
     *Mills v. Elec. Auto-Lite Co.*,
21       396 U.S. 375 (1970) ........................................................... 8, 23

22   *In re N.Y. Stock Exch./Archipelago Merger Litig.*,
23       824 N.Y.S.2d 764, 2005 N.Y. Slip Op. 52308(U) (2005) .................................... 11

24   *In re Netsmart Techs., Inc. S'holders Litig.*,
25       924 A.2d 171 (Del. Ch. 2007) ........................................................... 16, 18

26   *In re New York Stock Exch./Archipelago Merger Litig.*,
         824 N.Y.S.2d 764, 2005 NY Slip Op 52308(U), at *13 (N.Y. Sup. Ct. 2005) ...................... 11
27
     *Oliver v. Bos. Univ.*,
28       No. 16570-NC, 2006 Del. Ch. LEXIS 75 (Del. Ch. Apr. 14, 2006) ........................... 24

iii

*In re Orchard Enters., Inc.*,
   88 A.3d 1 (Del. Ch. 2014) ........................................................................... 23-24

*Parks Sch. of Bus. v. Symington*,
   51 F.3d 1480 (9th Cir. 1995) ................................................................................ 8

*In re Pure Res. S'Holders Litig.*,
   808 A.2d 421 (Del. Ch. 2002) ............................................................................ 18

*Republic Technology Fund, Inc. v. Lionel Corp.*,
   483 F.2d 540 (2d Cir. 1973) ......................................................................... 3, 4, 9

*Rodenfels v. PDC Energy*,
   No. 16-cv-00251-PAB-STV, 2017 U.S. Dist. LEXIS 49248 (D. Colo. Mar. 30, 2017) .......... 5

*Schulein v. Petrol. Dev. Corp.*,
   No. SACV 11-1891 AG (ANx), 2012 U.S. Dist. LEXIS 191649 (C.D. Cal. June 25, 2012)... 4

*SEC v. Mayhew*,
   121 F.3d 44 (2d Cir. 1997) ................................................................................... 9

*SEC v. Murphy*,
   626 F.2d 633 (9th Cir. 1980) ................................................................................ 3

*SEC v. Nat'l Student Mktg. Corp.*,
   457 F. Supp. 682 (D.D.C. 1978) ....................................................................... 3, 9

*SEC v. Todd*,
   642 F.3d 1207 (9th Cir. 2011) ........................................................................ 9, 10

*Smith v. Robbins & Myers*,
   969 F. Supp. 2d 850 (S.D. Ohio 2013) ........................................................ *passim*

*TSC Indus. v. Northway*,
   426 U.S. 438 (1976) ....................................................................................... 9, 15

*In re Tyson Foods, Inc. Consol. S'holder Litig.*,
   919 A.2d 563 (Del. Ch. 2007) ........................................................................... 23

*U.S. Bank Nat'l Assoc. v. Wilmington Tr. Co.  (In re Spansion, Inc.)*,
   426 B.R. 114 (Bankr. D. Del. 2010) .................................................................. 16

*United States v. Siegel*,
   717 F.2d 9 (2d Cir. 1983) ............................................................................. 10-11

*United States v. Smith*,
   155 F.3d 1051 (9th Cir. 1998) ............................................................................. 3

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*Universal Health Servs. v. United States ex rel. Escobar*,
    136 S. Ct. 1989 (2016) ................................................................ 4

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016) ..................................................... 4

*Weinberger v. Rio Grande Indus., Inc.*,
    519 A.2d 116 (Del. Ch. 1986) .................................................. 17

*In re Wells Fargo & Co. S'holder Derivative Litig.* ,
    282 F. Supp. 3d 1074 (N.D. Cal. 2017) ................................. 22

*Wilson v. Comm'r*,
    705 F.3d 980 (9th Cir. 2013) .................................................. 10

*Yamamoto v. Omiya*,
    564 F.2d 1319 (9th Cir. 1977) ................................................ 23

**Statutes & Rules**

15 U.S.C. § 78n(a) ....................................................................... *passim*

15 U.S.C. § 78t(a) ............................................................... 5, 7, 23, 25

17 C.F.R. § 240.14a-9 ......................................................... 8, 10, 20

**Other Authorities**

Gail Weinstein and Philip Richter, *2017: Where Things Stand — Appraisal, Business Judgment Rule and Disclosure*, HARVARD LAW SCHOOL FORUM ON CORPORATE GOVERNANCE AND FINANCIAL REGULATION (Feb. 28, 2017) ....................................................11

J. Robert Brown Jr., *Speaking with Complete Candor: Shareholder Ratification* and *the Elimination of the Duty of* Loyalty,
    54 HASTINGS L.J. 641, 643 (2003) ..........................................11

Juan E. Monteverde & Miles D. Schreiner, *Fair to Whom? Examining Delaware's Fair Summary Standard*, LAW360 (March 22, 2017) ........................................11

Lucian Arye Bebchuk & Marcel Kahan, *Fairness Opinions: How Fair Are They and What Can Be Done About It?*,
    1989 Duke L.J. 27, 30 (Feb. 1989) ..........................................12

Steven M. Davidoff, *Fairness Opinions*,
    55 Am. U. L. Rev. 1557 (Aug. 2006) ................................. 12, 15

## SUMMARY OF THE ACTION

Defendants disseminated a materially inadequate and misleading joint proxy statement/prospectus ("Proxy") to shareholders of Jaguar Animal Health, Inc. ("Jaguar" or the "Company") to solicit their votes in favor of a merger between Jaguar and Napo Pharmaceuticals, Inc. ("Napo") that was financially unfair to Jaguar shareholders (the "Merger" or "Transaction"). Specifically, the Proxy omitted four categories of material financial information bearing directly upon the value of the Jaguar shares held by Plaintiff and the Class and the financial unfairness of the Merger: (i) the projected unlevered free cash flows Jaguar and Napo were expected to generate between 2017 and 2026 ("Cash Flow Projections"); (ii) the pro-forma projections for Jaguar and Napo giving effect to the Transaction (the "Pro Forma Projections"); (iii) the probabilities of technical success rates determined by Jaguar management ("Probabilities of Technical Success Rates"), which were assumptions regarding the probability of the Company's drugs successfully making it to market that were relied upon in preparing the projections and valuation analyses that were disclosed in the Proxy; and (iv) the individual multiples calculated by Jaguar's financial advisor, Stifel, in connection with its Selected Companies and Transactions Analyses and the inputs underlying the discount rate utilized in connection with Stifel's Discounted Cash Flow Analysis. These four categories of financial information, if disclosed, would have significantly altered the total mix of financial information available to Jaguar's shareholders in the Proxy, and the omission of such information caused the valuation information and projections that were included in the Proxy to provide a misleading overall valuation picture of Jaguar, Napo, and the Merger. Amended Complaint ("AC") ¶¶ 27-36 (Dkt. No. 19).

The omitted financial information was particularly material to Jaguar shareholders in light of materially false and misleading statements in the Proxy regarding one of Jaguar's principal products, Equilevia. Equilevia is a premium product for total gut health in race horses.[1] The Proxy identified Equilevia as a *prescription* product, which required expensive clinical trials and was

---

[1] *See* press release announcing effectiveness of Merger, filed as Exhibit 99.1 to the Form 8-K dated July 31, 2017 (filed concurrently herewith as Exhibit 1 to Plaintiff's Request for Judicial Notice ("RJN")); Form S-3 Registration Statement filed August 4, 2017 (Exhibit 2 to RJN); Preliminary Prospectus Form 424B3 dated September 18, 2017 (Exhibit 3 to RJN).

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1   subject to a lengthy and uncertain regulatory approval process by the U.S. Food and Drug

2   Administration ("FDA") before it could hit the market.  Indeed, the Proxy made numerous

3   references to the risks associated with Equilevia as a *prescription* product, including that "Jaguar

4   expects to incur significant additional costs as it…undertakes the clinical trials necessary to obtain

5   regulatory approvals for…Equilevia, which will increase Jaguar's losses," and that "[t]he

6   successful development and commercialization of…Equilevia…will depend on a number of

7   factors, including….Jaguar's ability to demonstrate to the satisfaction of the FDA and any other

8   regulatory bodies, the safety and efficacy of Equilevia…"  Proxy at 38, 41.  However, *a mere four*

9   *days after Jaguar shareholders voted to approve the Merger*, Jaguar disclosed that Equilevia was

10  going to be Jaguar's "*next* expected veterinary product commercial launch" as a *non-prescription*

11  *product that would be ready to hit the market in 2017.*[2]  In other words, the Proxy materially

12  misrepresented the business plan regarding one of Jaguar's most important products.[3]  It was

13  therefore critical for Jaguar shareholders to have the above-referenced omitted financial

14  information, which would have enabled them to at least partially recognize the financial unfairness

15  of the Merger to them.

16      Three legal principles, applied collectively, indicate why Defendants' motion to dismiss

17  should be denied.  First, it is well-settled that financial projections and valuation information such

18  as the type omitted from the Proxy are material to shareholders faced with the significant decision

19  of whether to approve a merger.  *E.g.*, *Azar v. Blount Int'l, Inc.*, No. 3:16-cv-483-SI, 2017 U.S.

20  Dist. LEXIS 39493, at *15-16 (D. Or. Mar. 20, 2017) ("Numerous cases discuss the importance

21  of financial projections and cash flow analyses to shareholders… The established case law shows

22  _____

23  [2]   *Supra* note 1.
    [3]   The Amended Complaint does not identify these misrepresentations regarding Equilevia.

24  However, the Court may take judicial notice of the statements regarding Equilevia referenced
    herein, which all appear in Jaguar's SEC filings.  *See* Plaintiff's Request for Judicial Notice.

25  Plaintiff believes that the omitted financial information identified in the Amended Complaint was
    even more material in light of the false and misleading statements in the Proxy regarding Equilevia,

26  and he will seek leave to amend the Complaint to include the misrepresentations about Equilevia
    in the event Defendants' motion to dismiss is denied.  Further, in the event the Court grants the

27  motion, Plaintiff respectfully requests leave to amend, which Plaintiff would use to add allegations
    regarding the false and misleading Equilevia statements in the Proxy and address any other issues

28  identified by the Court.

1   the importance (and, hence, materiality) of financial projections to shareholders' decision-

2   making.")[4]; *Brown v. Brewer*, No. CV 06-3731-GHK (SHx), 2010 U.S. Dist. LEXIS 60863, at

3   *70-71 (C.D. Cal. June 17, 2010) ("A reasonable shareholder would have wanted to independently

4   evaluate management's internal financial projections to see if the company was being fairly

5   valued…the Ninth Circuit has observed that: 'investors are concerned, perhaps above all else, with

6   the future cash flows of the companies in which they invest.'"); *SEC v. Nat'l Student Mktg. Corp.*,

7   457 F. Supp. 682, 707 (D.D.C. 1978) ("In a merger transaction…accurate financial information is

8   necessary in order for a shareholder fairly to be able to vote.  'Perhaps nothing is more relevant to

9   a vote on whether or not to approve a merger than the earnings picture of the acquiring company,

10  at least to the stockholder of the company being acquired.'") (quoting *Republic Technology Fund,*

11  *Inc. v. Lionel Corp.*, 483 F.2d 540, 547 (2d Cir. 1973)).

12          Defendants contend that "[a]s a baseline proposition, federal courts in the Ninth Circuit

13  and elsewhere agree that financial projections and other soft financial information are generally

14  not material and need not be disclosed."  Defendants' Memorandum of Points and Authorities

15  ("MPA") at 10.  But this "proposition" is an inaccurate summary of the law.  *See United States v.*

16  *Smith*, 155 F.3d 1051, 1065-66 (9th Cir. 1998) (rejecting the argument that so-called "soft"

17  information such as projections are immaterial as a matter of law and collecting cases explaining

18  that forward-looking information can be material to shareholders depending upon the particular

19  circumstances at issue) (citing in part *Marx v. Computer Sciences Corp.,* 507 F.2d 485 (9th Cir.

20  1974) ("Nor can there be any doubt that the forecast of earnings was a 'material' fact… generally

21  earnings projections of a company constitute a prime factor in estimating the worth of its

22  stock…")); *SEC v. Murphy*, 626 F.2d 633, 653 (9th Cir. 1980) ("Surely the materiality of

23  information relating to financial condition, solvency and profitability is not subject to serious

24  challenge.").  Here, Jaguar indicated that the omitted Cash Flow Projections and Pro Forma

25  Projections were "reasonably prepared on the basis reflecting the best currently available estimates

26  and judgments of the management of Jaguar as to the future operating and financial performance

27  _____

28  [4]      All internal citations and quotations have been omitted and all emphasis added, unless
    stated otherwise.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1    of Jaguar and Napo...", Proxy at 277, and they were therefore not so unreasonably speculative as

2    to warrant their omission. *Infra*.

3          Second, when a corporate actor elects to disclose projections and valuation information to

4    shareholders, the actor may not cherry-pick the financial metrics to disclose while withholding

5    other readily available financial data that changes the overall valuation picture of the company or

6    transaction at issue. *See Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001) ("With regard

7    to future events, uncertain figures, and other so-called soft information, a company may choose

8    silence or speech elaborated by the factual basis as then known--but it may not choose half-

9    truths."); *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239-40(2d Cir. 2016) (explaining "half-

10   truths" are statements that are misleading under the Exchange Act "by virtue of what they omit to

11   disclose.") (citing *Universal Health Servs. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2000

12   (2016)); *see also Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008) ("[L]iteral truth is

13   not the standard for determining whether statements in a prospectus are misleading…'[s]ome

14   statements, although literally accurate, can become, through their context and manner of

15   presentation, devices which mislead investors.'").

16         Third, incomplete summaries of projections and valuation analyses can constitute

17   misleading statements within the meaning of the Exchange Act. *Republic Technology Fund*, 483

18   F.2d at 547 ("sales and earnings [] set forth in summarized form in a table" deemed misleading by

19   "failure to make full disclosure therein of all the facts bearing upon the Corporation's earning.");

20   *Smith v. Robbins & Myers*, 969 F. Supp. 2d 850, 871-74 (S.D. Ohio 2013) ("Plaintiff argues that

21   the omitted projections rendered the partially disclosed projections materially incomplete…if a

22   Proxy discloses valuation information, it must be complete and accurate."); *Schulein v. Petroleum*

23   *Dev. Corp.*, No. SACV 11-1891 AG (ANx), 2012 U.S. Dist. LEXIS 191649, at *21 (C.D. Cal.

24   June 25, 2012) ("Even if the disclosed valuations were correct in all other material respects,

25   Plaintiffs sufficiently allege that the final valuation picture was misleading because it did not

26   include the omitted production sources."); *City of Hialeah Emples. Ret. Sys. v. FEI Co*., No. 3:16-

27   cv-1792-SI, 2018 U.S. Dist. LEXIS 11989, at *38 (D. Or. Jan. 25, 2018) ("The result of the

28   analysis may be false or misleading if underlying assumptions or key inputs are omitted or

4

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1    misrepresented…"); *Rodenfels v. PDC Energy*, No. 16-cv-00251-PAB-STV, 2017 U.S. Dist.

2    LEXIS 49248, at *10 (D. Colo. Mar. 30, 2017) ("Misleading value estimates are actionable as

3    misrepresentations in the securities context even when they are based on opinion or are subject to

4    uncertainty."); *see also Kaufman v. Tallant (In re Tallant)*, 207 B.R. 923, 934 (Bankr. E.D. Cal.

5    1997) ("Courts have recognized that a half-truth may be as misleading as a statement that is wholly

6    false. For example, a statement is materially false under this section if it paints a substantially

7    untruthful financial picture.").  Indeed, the Ninth Circuit and numerous other courts have held that

8    even literally true information (here, the partially disclosed projections and incomplete valuation

9    summaries) can be rendered misleading by the omission of other relevant information. *Miller*, 519

10   F.3d at 886.  That is what Plaintiff alleges here.  AC ¶¶ 25-36.

11          Applying these legal principles indicates that the Amended Complaint sufficiently states a

12   claim against Defendants for violating Sections 14(a) and 20(a) of the Exchange Act.

13   Nevertheless, Defendants seek to classify the above-referenced material information that was

14   omitted from the Proxy as mere "accounting details" and "financial minute."  Def. MPA at 3, 12.

15   However, it is simply inaccurate to describe the types of projections and financial metrics that were

16   omitted from the Proxy as such.  The omitted financial information bore directly on the value of

17   Plaintiff's and the Class' Jaguar shares and the financial fairness (or lack thereof) of the Merger,

18   and significantly impacted the valuations calculated by Stifel.  As such, they are precisely the types

19   of financial metrics that courts have recognized are material to shareholders asked to vote on a

20   merger. *Infra*.

21                              **RELEVANT FACTUAL BACKGROUND**

22          In June 2013, Napo formed Jaguar to develop and commercialize animal health products.

23   AC ¶ 2.  Jaguar was a majority-owned subsidiary of Napo until the close of its initial public

24   offering in 2015.  *Id.*  Despite their technically separate corporate identities after Jaguar's initial

25   public offering, both companies and their leadership remained intricately linked together.  The

26   companies shared a headquarters in San Francisco, California, and Defendant Lisa Conte was the

27   founder of and served as the Chief Executive Officer of both companies.  Further, Defendant James

28   J. Bochnowski, who served as Chairman of the Jaguar board of directors, beneficially owned

                                                    5

1    approximately 6.5% of Napo's outstanding stock.  Proxy at 208.  Additionally, prior to the Merger,

2    Napo remained a dominant shareholder of Jaguar, holding 15.3% of Jaguar's stock (which was in

3    fact owned and/or controlled by the four individuals that comprised Napo's board of directors,

4    Lisa A. Conte, Richard W. Fields, Joshua Mailman and Gregory Stock).  Proxy at 52, 186.  Ms.

5    Conte held an additional 2.5% of Jaguar stock in her name, and Mr. Bochnowksi beneficially

6    owned 3.9% in his name.  *Id*. at 186.  Certain members of Jaguar's board of directors, as well as

7    certain of Jaguar's executive officers and employees also beneficially owned common stock in

8    Napo. As a group, Jaguar executive officers and directors, collectively beneficially own 9.8% of

9    the issued and outstanding common stock of Napo.  *Id*.

10        At the time the Merger was announced, Jaguar was an animal health company focused on

11   developing and commercializing gastrointestinal products for companion and production animals,

12   foals, and horses.  Proxy at 38.  The Proxy informed Jaguar shareholders that the Company was

13   substantially dependent on the success of three products: Equilevia, Canalevia and Neonorm.  *Id*.

14   at 40.  Two of the products, Equilevia and Canalevia, were described in the Proxy as "*prescription*

15   *drug product candidates,*" while Neonorm was a non-prescription product.  *Id*. at 38-40.  As

16   described in the Proxy, the difference between commercializing prescription drug candidates and

17   non-prescription drug candidates is significant.  In order to commercialize its prescription drug

18   product candidates, Jaguar needed to receive regulatory approval from the FDA in the United

19   States and other regulatory agencies in various jurisdictions.  *Id*. at 38.  The Proxy informed Jaguar

20   shareholders that "Jaguar has not yet received any regulatory approvals for its prescription drug

21   product candidates."  *Id*.  A mere four days after Jaguar shareholders voted to approve the unfair

22   Merger, Jaguar disclosed that it planned on pursuing a drastically different business plan with

23   respect to Equilevia; namely, that Equilevia would be marketed as a non-prescription product

24   expected to launch sales in 2017, rather than a prescription product subject to a strenuous

25   regulatory approval process whose likelihood of making it to market remained highly uncertain.

26        Napo is a pharmaceutical company focused on the development and commercialization of

27   Mytesi (formerly known as Fulyzaq), a human drug approved by the FDA for the symptomatic

28   relief of noninfectious diarrhea in adults with HIV/AIDS on antiretroviral therapy.  AC ¶ 4.

6

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

On March 31, 2017, Jaguar and Napo entered into a definitive agreement and plan of merger ("Merger Agreement"). As Defendants acknowledge, the terms of the Merger Agreement and the structure of the Transaction were extraordinarily complex. Def. MPA at 6; Proxy at 21. The structure of the Transaction evinces that this deal was meant to benefit an overleveraged Napo, its stakeholders, and the Individual Defendants, not Jaguar shareholders. In order to consummate the Transaction, Jaguar shareholders paid for the clearing of Napo's debt and a $3 million cash injection for Napo. AC ¶ 6. Further, Jaguar shareholders had their ownership stake and voting power in the combined company significantly reduced to approximately 20.2%. AC ¶ 5.

The Merger Consideration undervalued the Jaguar shares held by Plaintiff and the Class, and was the result of a flawed and unfair strategic review process, during which the Board made no effort to merge the Company with any party except Napo. AC ¶ 37. In early April 2016, the Board decided to engage Stifel for the sole purpose of evaluating the Merger with Napo, and declined to orchestrate any formal sales process or market check. *Id.*

Since the announcement of the Merger on March 31, 2017, Jaguar's stock price has severely dropped, losing nearly all of its value. AC ¶ 40. The stock went from nearly $1.00 per share at the time of the Merger announcement to $0.12 per share on January 8, 2018. AC ¶ 41. This evaporation of value is a clear indication that Jaguar shareholders suffered financial loss as a result of the Transaction, and that the market agrees that the Merger Consideration inadequately valued the shares held by Plaintiff and the Class.

In soliciting Jaguar shareholders to approve the unfair Transaction, Defendants allowed a materially incomplete and misleading Proxy to be disseminated to Jaguar shareholders on July 7, 2017. In doing so, Defendants violated Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9.

## APPLICABLE LEGAL STANDARDS

### I.    The Motion to Dismiss Standard

A complaint must have sufficient factual allegations to "state a claim to relief that is plausible on its face," but "detailed factual allegations are not required." *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009) (citing *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1 facially plausible "when the pleaded factual content allows the court to draw the reasonable

2 inference that the defendant is liable for the misconduct alleged." *Id.*

3     A motion to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) tests the

4 legal sufficiency of the claims alleged in the complaint. *See Parks Sch. of Bus., Inc. v. Symington*,

5 51 F.3d 1480, 1484 (9th Cir. 1995). When evaluating such a motion, the Court must "accept all

6 factual allegations in the complaint as true and construe the pleadings in the light most favorable

7 to the nonmoving party." *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).

## II. The Elements of a Section 14(a)/Rule 14a-9 Claim and the Federal Materiality/Misleading Statement Standard

9     Section 14(a) of the Exchange Act prohibits the solicitation of proxies in violation of SEC

10 rules and regulations. 15 U.S.C. § 78n(a)(1). The statute stems "from a congressional belief that

11 'fair corporate suffrage is an important right that should attach to every equity security bought on

12 a public exchange[]'" and was enacted for the "purpose of ensuring full and fair disclosure to

13 shareholders." *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375 381-382 (1970).

14     Rule 14a-9 prohibits proxy solicitations containing statements that are "false and

15 misleading with respect to any material fact" or that omit "any material fact necessary in order to

16 make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9(a). To adequately

17 state a claim under § 14(a) and Rule 14a-9, a plaintiff must allege that the Proxy "contained a false

18 or misleading statement or omission of material fact, made with at least negligence, that was an

19 essential link in accomplishing the [Transaction]." *Brown v. Brewer*, No. CV 06-3731-GHK

20 (JTLx), 2008 U.S. Dist. LEXIS 108904, at *12 (C.D. Cal. July 14, 2008).

21     In the context of a merger, a proxy statement is recognized as an essential link in the

22 accomplishment of the transaction. *See id.* at *21. Further, "[t]he requisite level of culpability, or

23 mental state, for a claim under § 14(a) is negligence." *Azar*, 2017 U.S. Dist. LEXIS 39493 at *25

24 (citing *Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674, 682-83 (9th Cir. 2005)). Accordingly,

25 Plaintiff need not establish that Defendants acted with scienter, and corporate directors and officers

26 are deemed negligent "as a matter of law…for failure to notice material omissions upon reading a

27 proxy statement." *Brown v. Brewer*, 2010 U.S. Dist. LEXIS 60863 at *24; *Fresno Cty. Emples.*

28

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

*Ret. Ass'n v. comScore, Inc.*, No. 16-cv-01820 (JGK), 2017 U.S. Dist. LEXIS 119648, at *71 (S.D.N.Y. July 28, 2017) (same).  Thus, the Private Securities Litigation Reform Act's ("PSLRA") requirement that the complaint "state with particularity facts giving rise to a strong inference that [Defendants] acted with the required state of mind" *i.e.*, acted negligently, essentially turns on whether the alleged misstatements and omissions are material.  *See Azar*, 2017 U.S. Dist. LEXIS 39493 at *28 ("materiality is related to negligence…the Amended Complaint here sufficiently alleges that the Proxy was materially misleading because it omitted the September Projections and also alleges that Defendants prepared, reviewed, or disseminated the Proxy. It sufficiently alleges, with particularly, a strong inference of negligence.").

"An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Indus. v. Northway*, 426 U.S. 438, 449 (1976).  "[I]t is well-established that a material fact need not be outcome-determinative; that is, it need not be important enough that it 'would have caused the reasonable investor to change his vote.' Rather, the information need only be important enough that it 'would have assumed actual significance in the deliberations of the reasonable shareholder.'" *Folger Adam Co. v. PMI Indus., Inc.*, 938 F.2d 1529, 1533 (2d Cir. 1991) (quoting *TSC Indus.*, 426 U.S. at 449).  "Information regarding a company's financial condition is material to investment." *SEC v. Todd*, 642 F.3d 1207, 1221 (9th Cir. 2011); *see also SEC v. Mayhew*, 121 F.3d 44, 52 (2d Cir. 1997) ("Material facts include those which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities.").  "[B]ecause a merger is one of the most important events that can occur for a small company, information regarding a merger can become material at an earlier stage than would be the case as regards [to] lesser transactions. Moreover, where information regarding a merger originates from an insider, the information, even if not detailed, takes on an added charge just because it is inside information." *Mayhew*, 121 F.3d at 52; *SEC v. Nat'l Student Mktg. Corp.*, 457 F. Supp. at 707 (same) (citing *Republic Technology Fund, Inc.*, 483 F.2d at 547).

"Whether an omission is 'material' is a determination that requires delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts and the significance

9

of those inferences to him, and these assessments are peculiarly ones for the trier of fact. Similarly, whether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier or fact." *Fecht v. Price Co.*, 70 F.3d 1078, 1080-81 (9th Cir. 1995). Accordingly, determining that an omission is immaterial as a matter of law or that a statement is not misleading as a matter of law "is only appropriate when the adequacy of the disclosure is so obvious that reasonable minds could not differ." *Todd*, 642 F.3d at 1220. Based upon the cases cited herein, Plaintiff respectfully submits that the omitted financial information cannot be deemed so obviously unimportant that no reasonable investor could possibly find such information material. Similarly, the incomplete projections and summaries of Stifel's valuation analyses contained in the Proxy should not be deemed to be not misleading as a matter of law.

Defendants continuously argue that they were only required to provide Jaguar shareholders with a "fair summary" of each company's projections and the valuation analyses Stifel performed. Def. MPA at 11-18. However, the "fair summary" standard Defendants invoke emanates from *Delaware fiduciary duty case law* addressing the details that Delaware law requires directors to disclose regarding a financial advisor's valuation analyses. The words "fair summary" do not appear in the text of Section 14(a) or Rule 14a-9, and this vague Delaware standard has no place in a Section 14(a) case. While certain district courts have inappropriately applied Delaware's disclosure standard without considering its origin or the text of Section 14(a) and Rule 14a-9 (including the federal cases Defendants rely upon), this Court should decline to do so. The text of Rule 14a-9 is clear as to what must be disclosed in a proxy ("*any* material fact necessary in order to make the statements therein not false or misleading") and what cannot appear in a proxy ("*any* statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to *any* material fact."). 17 C.F.R. § 240.14a-9. The Court must apply the unambiguous text of the Rule, and should not read standards from Delaware case law into the text of Rule 14a-9. *See Wilson v. Commissioner*, 705 F.3d 980, 988 (9th Cir. 2013) ("If the plain meaning of the statute is unambiguous, that meaning controls."); *see also United States v. Siegel*, 717 F.2d 9, 23-24 (2d Cir. 1983) (noting Congress responded to calls for federal regulation of corporate governance in light of state laws that are "too lax…by mandating disclosure through the

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1  various securities laws"); Juan E. Monteverde & Miles D. Schreiner, *Fair to Whom? Examining*

2  *Delaware's Fair Summary Standard*, LAW360 (March 22, 2017)[5].

3        It should also be noted that while Delaware courts profess to apply the U.S. Supreme

4  Court's definition of materiality, in practice they apply a much more stringent standard.  *See* J.

5  Robert Brown Jr., *Speaking with Complete Candor: Shareholder Ratification* and *the Elimination*

6  *of the Duty of* Loyalty, 54 HASTINGS L.J. 641, 643 (2003) ("The interpretation of materiality by

7  Delaware courts lies in sharp contrast to that used in the federal system.  Although both rely on an

8  identical definition of materiality, a comparison of cases suggests that, while state courts use the

9  same terminology, they rely on a far more restrictive interpretation. As a result, shareholders do

10  not always receive information that federal courts would deem 'important' to a 'reasonable

11  investor.").[6]  In other words, Delaware's materiality case law should serve as the ceiling for

12  materiality in federal court, not the floor.

13        Based upon these applicable legal standards, and for the reasons set forth in greater detail

14  below, Defendants' motion to dismiss should be denied.

15  **ARGUMENT**

16  **I.**      **The Proxy Omitted Material Projections and Valuation Information, Rendering**

17        **the Disclosed Financial Information Materially Incomplete and Misleading**

18        Defendants retained Stifel to opine on the financial fairness of the Transaction to Jaguar's

19  shareholders.  Directors routinely retain bankers to provide such "fairness opinions" as a means of

20  shielding themselves from liability for breach of fiduciary duty claims.  However, the fundamental

21  flaws of so-called "fairness opinions" have been noted by courts and academics for decades.[7]  In

---

22    [5]     Available at https://www.law360.com/articles/904292/fair-to-whom-examining-delaware-s-fair-summary-standard

23    [6]     *See also* Gail Weinstein and Philip Richter, *2017: Where Things Stand — Appraisal,*

24  *Business Judgment Rule and Disclosure*, HARVARD LAW SCHOOL FORUM ON CORPORATE GOVERNANCE AND FINANCIAL REGULATION (Feb. 28, 2017) (prominent defense lawyers noting

25  the Delaware Court of Chancery has begun applying a "stricter standard for materiality of disclosure" and "has not viewed as material what it has characterized as 'details' regarding the sale

26  process, including with respect to bankers' analyses, that, in our view, in the past might well have been deemed material."), available at https://corpgov.law.harvard.edu/2017/02/28/2017-where-

27  things-stand-appraisal-business-judgment-rule-and-disclosure/.

28    [7]     *E.g.*, *In re New York Stock Exch./Archipelago Merger Litig.*, 824 N.Y.S.2d 764, 2005 NY Slip Op 52308(U), at *13 (N.Y. Sup. Ct. 2005) (describing fairness opinions as "watered down

11

---

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

light of the significant flaws with fairness opinions and bankers' valuation analyses and the inherent conflicts of interest that permeate the fairness opinion process, complete and accurate financial information is of the utmost importance to shareholders asked to vote on a transaction as complex as the one at issue here.

To facilitate Stifel's "fairness opinion" Defendants furnished Stifel with various projections and financial information. The Proxy states that Stifel:

- reviewed certain non-publicly available financial analyses, financial projections, reports and other information concerning Jaguar furnished to Stifel by the management of Jaguar, including projections for Jaguar *reflecting the probability of technical success determined by the management of Jaguar* (the "Jaguar Projections"), and utilized per instruction of Jaguar;

- reviewed certain publicly available information and data concerning Napo and certain non-publicly available information and data concerning Napo furnished to Stifel by the management of Jaguar, including audited consolidated financial statements of Napo for the year ended December 31, 2016, and certain financial analyses, financial projections, reports and other information concerning Napo furnished to Stifel by the management of Jaguar, including projections for Napo *reflecting the probability of technical success determined by the management of Jaguar* (the "Napo Projections"), and utilized per instruction of Jaguar;

- reviewed pro-forma projections for Jaguar and Napo giving effect to the Transaction and *reflecting the probabilities of technical success determined by the management of Jaguar* (the "Pro Forma Projections"), provided by the management of Jaguar;

- reviewed and analyzed, based on the Jaguar Projections, the cash flows generated by Jaguar on a stand-alone basis to determine the present value of the discounted cash flows;

- reviewed and analyzed, based on the Napo Projections, the cash flows generated by Napo on a stand-alone basis to determine the present value of the discounted cash flows.

---

and toothless" because "conflicts between the board and financial experts who issue fairness opinions have become the norm instead of the exception."); Lucian Arye Bebchuk & Marcel Kahan, *Fairness Opinions: How Fair Are They and What Can Be Done About It?*, 1989 Duke L.J. 27, 30 (Feb. 1989) ("[D]iscretion enables investment banks to act opportunistically. Investment bankers can formulate fairness opinions serving their and the managers' interests, rather than ones reflecting their best judgments of fair price. And. . . investment banks have strong incentives to write opinions that satisfy the managers who hire them and negotiate their fees."); Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1562 (Aug. 2006) ("[C]urrent fairness opinion practice is still deeply flawed. Fairness opinions, and their underlying valuation analyses…are frequently prepared utilizing methodologies that simply do not jibe with best practices.").

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Proxy at 276.   However, as noted above, the Proxy conspicuously omitted four categories of material financial information: (1) the Cash Flow Projections; (2) the Pro Forma Projections; (3) the Probabilities of Technical Success Rates; and (4) the individual multiples and discount rate inputs.

### A.   The Omission of the Cash Flow Projections and Pro Forma Projections Rendered the Projections on Pages 289-290 of the Proxy and the Summaries of Stifel's Contribution Margin Analysis and Discounted Cash Flow Analysis Incomplete and Misleading

### 1.   The Cash Flow Projections

The omission of the Cash Flow Projections rendered the table of projections set forth on pages 289-290 of the Proxy misleading, because the disclosed metrics (revenue, EBITDA, net income, and operating income) *are not sufficient analogs for cash flow projections*.   Well settled principles of corporate finance and valuation dictate that the value of stock she be premised upon a company's projected future cash flows.   AC ¶¶ 26-27.   And numerous financial experts agree that the metrics that were disclosed here, such as revenue and EBITDA, *differ in significant ways from cash flow*, and do not provide an accurate overall valuation picture of a company.   *Id*.   The Amended Complaint explains why revenue and EBITDA *are not* a sufficient alternative to cash flow projections when trying to value stock, and why metrics such as revenue and EBITDA, when disclosed *without* cash flow projections for the corresponding period, are inherently misleading financial metrics.   *Id*.   Defendants seek to dispute this well-supported factual assertion and argue that "EBITDA projections are a 'very close proxy' for unlevered free cash flows."   Def. MPA at 13.   Defendants' assertion directly contradicts the factual allegations set forth in the Amended Complaint, and has been rejected by numerous financial experts including the ones cited in the Amended Complaint[8].   At this procedural juncture, all of the factual allegations in the Amended Complaint must be accepted as true.   At summary judgment or trial Defendants can introduce

---

[8]   *See also* Shannon Pratt, *Net Cash Flow: The Preferred Measure of Return*, *Cost of Capital* 16 ("Occasionally, we find an analyst treating earnings before interest, taxes, depreciation, and amortization (EBITDA) as if it were free cash flow. This error is not a minor matter…"); Thomas Copeland, *Financial Theory and Corporate Policy*. 3rd ed. 24 ("The main difference between the accounting definition and the economic definition of profit is that the former does not focus on cash flows when they occur, whereas the latter does… Financial managers are frequently misled when they focus on the accounting definition of profit…").   Numerous other financial authorities support the proposition.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1   expert testimony and evidence to explain why, contrary to the opinion of numerous financial

2   experts, the revenue, EBITDA, and income projections included in the Proxy were sufficient

3   analogs for cash flow projections and portrayed each company's financial prospects in a financially

4   accurate light that allowed Jaguar shareholders to properly value their shares and assess the

5   financial fairness of the Merger.  But such an issue cannot be resolved on a motion to dismiss.  *See*

6   *Azar,* 2017 U.S. Dist. LEXIS 39493 at *17-18 ("Plaintiffs allege that the Proxy Statement was

7   incomplete for failing to contain a specific set of projections that would have provided a more

8   accurate picture of the Company's performance and of management's forecasts. Such a factual

9   assertion can later be proven or disproven on summary judgment or at trial, but it is not

10  conclusory.").

11        The omission of the Cash Flow Projections also rendered the summary of Stifel's

12  Contribution Margin Analysis on page 287 of the Proxy and its Discounted Cash Flow Analysis

13  on pages 285-86 of the Proxy misleading.  The Contribution Margin Analysis provided unlevered

14  free cash flow contribution margin percentages for Jaguar and Napo for years 2022 through 2026,

15  *but failed to disclose and denoted as "NM", i.e., "not meaningful", the contribution margin*

16  *percentages for years 2017 through 2021.*  What was found to be "not meaningful" about the cash

17  flow contribution margin percentages for these years? The Proxy does not say.   In their

18  memorandum, Defendants assert that for those years, "Stifel's analysis indicates that the projected

19  *difference* between Jaguar's and Napo's expected contribution after the Merger was 'not

20  meaningful.'"  Def. MPA at 19.  The Proxy does not explain what "*difference*" in cash flow

21  contributions Stifel deemed to be "not meaningful."  However, based upon the projections included

22  in the Proxy for net income, it appears that the contribution differences Stifel deemed "not

23  meaningful" were actually quite significant.  For example, for 2019, Jaguar's net income was

24  projected to be $1.8 million, while Napo's net income was projected to be *negative* $20.3 million.

25  Proxy at 289-90.  That is far from a "not meaningful" difference.  Further, the lowest difference in

26  cash flow contribution percentages that is disclosed is 20% (*i.e.* 60% for Jaguar and 40% for Napo

27  in 2022), Proxy at 287, which suggests that the undisclosed purportedly "not meaningful" cash

28  flow contribution percentages could have been just slightly below 20%.  Jaguar shareholders had

14

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1   no idea; rather, all they were provided with was a banker's bald assertion that the hidden numbers

2   were "not meaningful."

3       It is misleading to "summarize" an analysis while simultaneously withholding cash flow

4   contribution margin percentages for five of the ten years summarized, particularly when such

5   percentages likely differed by amounts that were in fact "meaningful" to Jaguar shareholders trying

6   to assess the value of their shares and the financial fairness of the complex Transaction.

7   Defendants argue that because Stifel deemed the omitted cash flow contribution percentages "not

8   meaningful" such percentages must be deemed immaterial as a matter of law.  Def. MPA at 19.

9   But the materiality standard is governed by the view of "a reasonable *shareholder*", *TSC Indus.*,

10  426 U.S. at 449, not a *banker* that was paid $1 million to prepare an opinion supporting the

11  purported fairness of the transaction at issue.  Proxy at 287.

12      Additionally, "summarizing" a Discounted Cash Flow Analysis while omitting the most

13  significant input in the analysis, the Cash Flow Projections, is inherently misleading.  AC ¶¶ 26,

14  32-33.  The summary of Stifel's Discounted Cash Flow Analysis set forth the perpetuity growth

15  rates and discount rates Stifel utilized, Proxy at 285-86, but disclosing only those metrics while

16  withholding the actual Cash Flow Projections impeded shareholders from properly analyzing the

17  legitimacy of the analysis and resulting valuation ranges.  *See Robbins & Myers*, 969 F. Supp. 2d

18  at 871-72.  As a highly-respected professor explained in one of the most thorough law review

19  articles regarding the fundamental flaws with the valuation analyses bankers perform in support

20  of fairness opinions, in a discounted cash flow analysis a banker takes management's forecasts,

21  and then makes several key choices (such as a discount rate) "which can significantly affect the

22  final valuation."  Steven M. Davidoff, Fairness Opinions, 55 Am. U.L. Rev. 1557, 1576 (Aug.

23  2006).  As Professor Davidoff explained:

24          There is substantial leeway to determine each of these, and any change can
            markedly affect the discounted cash flow value. For example, a change in the
25          discount rate by one percent on a stream of cash flows in the billions of dollars can
            change the discounted cash flow value by tens if not hundreds of millions of
26          dollars….This issue arises not only with a discounted cash flow analysis, but with
            each of the other valuation techniques.  This dazzling variability makes it difficult
27          to rely, compare, or analyze the valuations underlying a fairness opinion *unless full
            disclosure is made of the various inputs in the valuation process, the weight
28          assigned for each, and the rationale underlying these choices*. The substantial

15

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

1
2
discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

3 *Id*. at 1577-78 (emphasis added). Additionally, because the discount rate significantly impacts the

4 resulting valuation, *id*., the financial inputs and assumptions underlying the discount rate selected

5 by Stifel were also material to shareholders. *See U.S. Bank Nat'l Assoc. v. Wilmington Tr. Co. (In*

6 *re Spansion, Inc.)*, 426 B.R. 114, 133 (Bankr. D. Del. 2010) ("An important piece of the DCF

7 analysis is a determination of the discount rate, or the weighted average cost of capital.").

8       In sum, without the actual Cash Flow Projections, the "implied equity values" for Napo

9 and Jaguar set forth on pages 285-86 of the Proxy amounted to mere conclusions regarding the

10 value of Jaguar and Napo, without the material "key inputs" that were utilized to arrive at those

11 valuations. *See In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 204 (Del. Ch. 2007).

12       **2.   The Pro Forma Projections**

13       Defendants contend the Pro Forma Projections were immaterial as a matter of law to Jaguar

14 shareholders because the Proxy included: (i) Jaguar's and Napo's management projections on a

15 stand-alone, pre-transaction basis; and (ii) combined financial statements of Jaguar and Napo, on

16 a pro forma basis. Def. MPA at 15. However, neither category of information was a sufficient

17 analog for the Pro Forma Projections.

18       The Pro Forma Projections were projections for the combined company giving effect to

19 the Transaction. Proxy at 276. In other words, they projected the financial performance of the

20 combined corporate entity that Jaguar shareholders needed to decide if they wanted to vote in favor

21 of creating, thereby diluting their ownership and voting percentage. The Pro Forma Projections

22 represented management's insight and provided the clearest picture of the value of the combined

23 company. Thus, they were material to the question set before Jaguar shareholders – whether to

24 approve the Transaction and accept a significantly smaller ownership stake in the post-Transaction

25 combined company. *Supra*. The omission of the Pro Forma Projections caused the overall

26 valuation picture of the Transaction provided by the sections of the Proxy discussing the value of

27 Jaguar and Napo to be misleading, as shareholders were unable to assess the financial fairness of

28 the Transaction in light of the expected financial results of the combined company. AC ¶ 28.

16

1    The authorities cited by Defendants on this issue are easily distinguishable.  In *Chi. Male*

2    *Med. Clinic, LLC v. Ultimate Mgmt.*, No. EDCV 13-00199 SJO (OPx), 2014 U.S. Dist. LEXIS

3    174478 (C.D. Cal. Dec. 16, 2014), the pro forma projections were alleged to be *false statements*,

4    not *material omissions*.  *Id*. at \*25.  In other words, the pro forma projections at issue in that case

5    were disclosed to plaintiff, who took issue with how they were described.  *Id*.  The court rejected

6    the argument that they were false statements, because it was clear from the information available

7    to plaintiff that they were "hastily prepared, estimated projections."  *Id*.  Here, the Proxy makes

8    clear that the omitted Pro Forma Projections were not so unreliable as to warrant their omission.

9    Indeed, it states that "Stifel assumed, at the direction of Jaguar, that they were reasonably prepared

10   on the basis reflecting the best currently available estimates and judgments of the management of

11   Jaguar as to the future operating and financial performance of Jaguar and Napo..."  Proxy at 277.

12   This fact also renders another of Defendants' authorities, *Weinberger v. Rio Grande Indus., Inc.*,

13   519 A.2d 116 (Del. Ch. 1986), distinguishable and helpful to Plaintiff's position.  There, the court

14   noted the trend towards disclosing forward-looking information in light of "the increase in

15   mergers…"  *Id*. at 127.  The court explained that several factors weighed against finding the pro

16   forma projections material there, including the fact that it was "*not a case where the questioned*

17   *information was prepared for valuation purposes and to assist management in making a business*

18   *decision as to the amount of the tender offer or merger consideration*."  *Id*. at 130.  Further, the

19   *Weinberger* Court was faced with a motion for summary judgment, and concluded that plaintiff

20   had not satisfied "the burden of proving the materiality of the alleged factual omissions."  *Id*. at

21   130-31.  As noted above, for Defendants' motion to dismiss to be granted on materiality grounds,

22   Plaintiff need not establish that the omitted information was material as a matter of law; rather,

23   Defendants must persuade the Court that the omitted information was *immaterial* as a matter of

24   law, *i.e.* that no reasonable shareholder could possibly find the omitted information important.

25   Plaintiff respectfully submits that Defendants have not and cannot met that burden.

26   **B.  The Probabilities of Technical Success Rates**

27       The Proxy also omitted the Probabilities of Technical Success Rates, which rendered the

28   valuation analyses and projections that *purportedly* accounted for such rates misleading.  *See*

17

Proxy at 276 (noting the Jaguar and Napo projections reflected the probabilities of technical success). Given that Jaguar was an animal health company whose value was directly tied to its ability to get its products to market, the Probabilities of Technical Success Rates clearly would have assumed actual significance in the mind of a reasonable Jaguar shareholder. Even Delaware courts, which apply a different and more stringent disclosure standard than the one set forth in Section 14(a)/Rule 14a-9, have agreed. *See In re Micromet, Inc. S'holders Litig.*, No. 7197-VCP, 2012 Del. Ch. LEXIS 41, at *24 (Del. Ch. Feb. 29, 2012) (denying preliminary injunction motion predicated upon failure to disclose "the basis and criteria for the selection of the probability of success rates", because the board was not "required to disclose additional information *beyond the actual rates provided to [financial advisor]*.").

Defendants contend the Probabilities of Technical Success Rates were immaterial because the projections and financial analyses that were summarized in the Proxy accounted for the probabilities of success. Def. MPA at 15. However, if true, this only increased the materiality of the actual Probability of Success *Rates* themselves; without the actual rates, shareholders had no idea whether the projections and analyses contained in the Proxy were premised upon unreasonably high or low probabilities of success. In other words, shareholders had no idea whether the projections and analyses summarized in the Proxy were based upon an assumption of a 100% probability of success, a 50% probability of success, or a 10% probability of success. The actual rates undoubtedly had a significant impact on the final valuation metrics and projections that were disclosed in the Proxy (if such projections and valuations did in fact account for a less than 100% probability of success, *see infra*). Courts have recognized that such "key assumptions" or "key inputs", *i.e.* financial assumptions utilized by a banker in its analyses that significantly impact the final valuation figure arrived at, are material to shareholders. *See In re Pure Res. S'holders Litig.*, 808 A.2d 421, 449 (Del. Ch. 2002); *Netsmar*t, 924 A.2d at 204.

Complicating matters for Jaguar shareholders, a material statement within the *Jaguar and Napo Unaudited Prospective Financial Information* section of the Proxy is inconsistent with the above statements. On page 288, the Proxy states that the Jaguar and Napo Projections were "provided to Jaguar's financial advisor" and assumed "that each party's strategic growth plan, in

particular in [sic] regulatory approval of products for new markets, *would be successfully executed*." This statement contradicts the statements on page 276 that the projections utilized by Stifel "*reflect[ed] the probability of technical success* determined by the management of Jaguar." In other words, the statements on page 276 of the Proxy suggest that the projections Stifel used to prepare its valuation analyses *were discounted to reflect a probability of technical success* (*i.e.*, less than 100% chance of success), while the statement on page 288 of the Proxy indicates that the disclosed projections assumed success would be achieved (*i.e.*, 100% success with no discount for a probability of technical success less than 100%). As a result of these inconsistent statements and Defendants' failure to disclose the Probabilities of Technical Success Rates, Jaguar shareholders had no idea whether the projections disclosed on page 289-90 of the Proxy and Stifel's valuation analyses summarized on pages 280-287 of the Proxy assumed a 100% probability of technical success or something lower. Such a fact was material to shareholders trying to assess the legitimacy of the disclosed projections and Stifel's valuation analyses.

## C. The Individual Multiples Stifel Calculated in Connection With its Selected Companies and Transactions Analyses

The Proxy also failed to disclose the individual multiples Stifel calculated for each company and transaction it utilized in its *Selected Publicly Traded Companies* and *Selected Precedent* Transactions Analyses. *See* Proxy at 280-85. The omission of these multiples rendered the summaries of these analyses and the corresponding implied equity value ranges materially misleading. *See Robbins & Myers*, 969 F. Supp. 2d at 872-74 (finding omitted multiples constituted material, "critical financial" information, that was necessary for the company's shareholders to make an informed decision in connection with the merger). A non-misleading summary of these analyses required the disclosure of the *individual* multiples for *each* company and transaction; merely providing the range applied by the banker and the mean and median multiples observed was insufficient, as shareholders were unable to assess whether Stifel applied appropriate multiples based upon the most comparable companies and transactions.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1

**II.     The Cases Relied Upon by Defendants Applied Different Standards or are Factually Distinguishable**

2       As the above-cited cases illustrate, motions to dismiss Section 14(a) actions predicated on

3  incomplete and misleading "summaries" of only certain cherry-picked projections or only certain

4  financial metrics utilized in a banker's valuation analyses are often denied.  Defendants rely upon

5  distinguishable or erroneously decided cases in support of their argument that all of the omitted

6  financial information is immaterial (which they must establish *as a matter of law* for Plaintiff's

7  complaint to be dismissed).

8       Most of the federal cases Defendants cite involved the application of Delaware's "fair

9  summary" disclosure standard, either because the plaintiff asserted a claim for breach of fiduciary

10 duty under Delaware law or because the court failed to appreciate the difference between Delaware

11 case law and the text of Rule 14a-9 (*Malon, Masters*, *Sodhi*, *La. Mun. Police Emps.' Ret. Sys.*,

12 *Calleros*).  Def. MPA at 16.  As noted above, the text of Rule 14a-9 does not support a "fair

13 summary" disclosure standard; rather, it prohibits a proxy statement from "containing any

14 statement which, at the time and in the light of the circumstances under which it is made, is false

15 or misleading with respect to *any* material fact, or which omits to state *any* material fact necessary

16 in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.  Other

17 cases cited by Defendants involved motions for preliminary injunctions (*Malon* and *Masters*),

18 which require a much higher standard to prevail on than defeating a motion to dismiss (*i.e.* a

19 likelihood of success on the merits) and require a court to make a materiality determination *as a*

20 *matter of law* rather than defer the issue to a jury.  The remaining federal cases cited by Defendants

21 are factually distinguishable from this action.

22       In *City of Hialeah Emples. Ret. Sys. v. FEI Co.*, No. 3:16-cv-1792-SI, 2018 U.S. Dist.

23 LEXIS 11989 (D. Or. Jan. 25, 2018), the proxy actually disclosed the cash flow projections used

24 by the banker in its valuation analyses, which "were included in the Lower Projections table…"

25 *Id.*  at *10.  The board instructed its banker Goldman Sachs to "base its analysis for the Fairness

26 Opinion on the Lower Projections…"  *Id.* at *9.  Nevertheless, the plaintiff sought the cash flow

27 projections for the higher alternative set of projections (referred to as the Higher Projections), *even*

28 *though Goldman Sachs did not base its valuation analyses on the Higher Projections.  Id.*  Here,

20

the Cash Flow Projections that formed the basis of Stifel's Discounted Cash Flow Analysis and Contribution Margin Analysis *were completely omitted from the Proxy*. Further, the Proxy failed to define or describe the metrics that were used to calculate the Cash Flow Projections. The *FEI Co.* Court also noted that the results of a valuation analysis "may be false or misleading if underlying assumptions or key inputs are omitted or misrepresented…", *id*. at *38, which is exactly what Plaintiff has sufficiently alleged happened here.

Defendants also cite to *In re Hot Topic, Inc. Sec. Litig*., 2014 U.S. Dist. LEXIS 180513 (C.D. Cal May 2, 2014) to support their argument that the projections Defendants omitted from the Proxy are immaterial as a matter of law. Def. MPA at 11. In a similar factual scenario to *FEI Co.*, the *Hot Topic* Court found that the omission of certain line items from one set of projections that were included for the other set of projections—the set management represented to be more accurate—did not *alone* constitute a violation under Section 14(a). *Id*. at *25. But, the court went on to explain:

> However, Plaintiff may present this omitted information in conjunction with its allegations regarding the relative accuracy of the Revised Projections and the LRP Projections. Insofar as the omitted details prevented shareholders from realizing the relative inaccuracy of the projections, they may have "affirmatively create[d] an impression of a state of affairs that differs in a material way from the one that actually exist[ed]." *Brody*, 280 F.3d at 1006.

*Id*. at 26-27.

Here, Plaintiff alleges that the disclosed projections, without the Cash Flow Projections, created a misleading valuation picture of the companies because cash flow projections are necessary to properly value a company, and EBITDA projections fail to account for various issues such as "capital expenditures, working capital requirements, current debt payments, taxes, or other fixed costs that are critical to understand a company's value." AC ¶ 27. Plaintiff supports this assertion with citations to financial sources, *id*., and numerous others support the same proposition. *Supra*. These allegations also render *Hysong v. Encore Energy Partners LP*, No. 11-781, 2011 U.S. Dist. LEXIS 130688 (D. Del. Nov. 10, 2011) distinguishable, because there the plaintiff failed to allege any misleading statement. *Id*. at *22-23. Defendants may challenge this factual assertion with evidence or experts at a later stage of the proceedings, but they cannot simply refute Plaintiff's

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1 supported factual allegations by arguing that the disclosed projections were sufficiently analogous

2 to the undisclosed Cash Flow Projections as a matter of law.  *See Azar,* 2017 U.S. Dist. LEXIS

3 39493 at *17-18.

4       In sum, information regarding a company's financial prospects is material to shareholders,

5 particularly in the context of a merger or business combination.  *Supra.*  The above-referenced

6 financial information that was omitted from the Proxy would have significantly altered the total

7 mix of valuation information that was included in the Proxy.  Nevertheless, Defendants omitted

8 such financial information from the Proxy, and, by doing so, rendered the financial information

9 included in the Proxy incomplete and misleading.

10    **III.**   <u>**Plaintiff Has Adequately Pled Loss Causation**</u>

11       Loss causation in a Section 14(a) action is adequately pled where the plaintiff alleges that

12 shareholders "directly authorized a transaction that resulted in a harm" based upon a misleading

13 proxy.  *In re Wells Fargo & Co. S'holder Derivative Litig.*, 282 F. Supp. 3d 1074, 1104-05 (N.D.

14 Cal. 2017).  Plaintiff need "not plead a precise figure at which the Company's stock should have

15 been valued" so long as "the allegations that Plaintiffs set forth suffice to make plausible the claim

16 that the Company's stock was worth more than [what Plaintiff received in the Transaction]."  *Azar*,

17 2017 U.S. Dist LEXIS 39493 at *33.  The Amended Complaint easily satisfies this threshold, as it

18 alleges that the Transaction undervalued the shares held by Plaintiff and the Class, and illustrates

19 the virtually complete eradication of Jaguar stock value since the announcement of the

20 Transaction. AC ¶¶ 37-41.  These allegations are more than sufficient to plead loss causation.  *See*

21 *In re Hot Topic, Inc. Sec. Litig.*, 2014 U.S. Dist. LEXIS 180513 at *28 (loss causation adequately

22 pled where "Plaintiff's claims rest on its allegation that the Merger Consideration was actually a

23 discount to Hot Topic's enterprise value and intrinsic value"); *Robbins & Myers*, 969 F. Supp. 2d

24 at 868 (loss causation adequately pled where plaintiff alleged "[a]s a result of the false and

25 misleading Proxy, the Company's former shareholders were precluded from casting a fully

26 informed vote in connection with the Merger and many agreed to give up their equity interests in

27 the Company in exchange for the inadequate Merger consideration.").

28

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1    In sum, Plaintiff has sufficiently pled loss causation by alleging that Plaintiff and the Class

2    suffered financial loss as a result of the Transaction (*i.e.* retained an inadequate ownership stake

3    in the post-Transaction combined company and suffered financial loss as a result of the significant

4    drop in Jaguar's trading price that was spurred by the unfair Merger), which could not have been

5    effectuated without the misleading Proxy.

6    **IV.    Plaintiff's Claims Are Direct, Not Derivative**

7        The Amended Complaint is properly pled as a direct shareholder class action for violations

8    of Sections 14(a) and 20(a) the Exchange Act and Rule 14a-9.   Accordingly, Plaintiff is not

9    required to plead demand futility.   The crux of the Amended Complaint is that Plaintiff and the

10   Class were denied their right to an informed vote as a result of the materially incomplete and

11   misleading Proxy, which was an essential link in the completion of a transaction that was

12   financially unfair to them, diluted both their equity stake and voting power in the post-Transaction

13   company, and caused a significant decrease in the trading price of their shares.   Viewing the alleged

14   harm to Plaintiff and the Class as pled in the Amended Complaint, Plaintiff's claims are direct, not

15   derivative.

16       The Ninth Circuit has held that, in light of the Supreme Court's opinions in *J. I. Case Co.*

17   *v. Borak*, 377 U.S. 426 (1964) and *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375 (1970), "a shareholder

18   who alleges a deceptive or misleading proxy solicitation is entitled to bring both direct and

19   derivative suits. The former action protects the shareholders' interest in fair corporate suffrage."

20   *Yamamoto v. Omiya*, 564 F.2d 1319, 1326 (9th Cir. 1977); *see also Katz v. Pels*, 774 F. Supp. 121,

21   127 (S.D.N.Y. 1991) (same); *Bradshaw v. Jenkins*, No. C83-771R., 1984 U.S. Dist. LEXIS 24101,

22   at *5-9 (W.D. Wash. Aug. 27, 1984) (same).   The injury of an uniformed vote is independent of

23   any injury to the corporation and implicates a duty of disclosure owed to shareholders.   *See In re*

24   *Tyson Foods, Inc.*, 919 A.2d 563, 601 (Del. Ch. 2007) ("Where a shareholder has been denied one

25   of the most critical rights he or she possesses--the right to a fully informed vote--the harm suffered

26   is almost always an individual, not corporate, harm.").   Indeed, in an analogous context, Delaware

27   courts have held that shareholders alleging a breach of the fiduciary duty of disclosure may pursue

28   a "quasi-appraisal" remedy directly.   *See In re Orchard Enters., Inc.*, 88 A.3d 1, 42 (Del. Ch. 2014)

23

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

1  ("One cause of action where the Delaware Supreme Court and the Court of Chancery consistently

2  have held that quasi-appraisal damages are available is when a fiduciary breaches its duty of

3  disclosure in connection with a transaction that requires a stockholder vote. The premise for the

4  award is that without the disclosure of false or misleading information, or the failure to disclose

5  material information, stockholders could have voted down the transaction and retained their

6  proportionate share of the equity in the corporation as a going concern. Quasi-appraisal damages

7  serve as a monetary substitute for the proportionate share of the equity that the stockholders

8  otherwise would have retained."). Furthermore, "[v]oting power dilution may constitute a direct

9  claim, because it can directly harm the shareholders without affecting the corporation, and any

10 remedy for the harm suffered under those circumstances would benefit the shareholders." *Oliver*

11 *v. Bos. Univ.*, No. 16570-NC, 2006 Del. Ch. LEXIS 75, at *76 (Del. Ch. Apr. 14, 2006).

12        As noted above, the main injuries claimed in this case are the impairment of shareholder's

13 voting rights, and the erosion of the value of the stock held by Jaguar shareholders.  Such injuries

14 do not affect the corporation.  First, a corporation does not vote on a transaction and has no suffrage

15 rights—shareholders vote.  Therefore, only shareholders are harmed when their voting rights are

16 infringed.  Second, a corporation does not suffer the damages for loss of stock value, shareholders

17 do.  Further, even viewing Plaintiff's alleged injury as one of dilution, he has still stated a direct

18 claim.  As the Delaware Supreme Court has held, "a 'stock dilution' claim may be brought as a

19 direct claim if voting rights are harmed." *Gentile v. Rossette*, 906 A.2d 91, 98 (Del. 2006).  Here,

20 given the dominating nature of Napo over Jaguar, the claims fit within the parameters discussed

21 in *Gentile*.  *See* Proxy at 52 ("As of June 30, 2017, Napo owned in the aggregate approximately

22 15.3% of Jaguar common stock. This concentration of ownership gives Napo significant influence

23 over the way Jaguar is managed and the direction of Jaguar's business.").

24        Further, any recovery would flow solely to Jaguar shareholders prior to the Merger, not the

25 combined company or former Napo shareholders.  In the Prayer for Relief, the Amended

26 Complaint clearly prays for damages for former Jaguar shareholders.  Thus, Plaintiff has properly

27 pled his complaint as a direct shareholder action.  See *Tooley v. Donaldson, Lufkin, & Jenrette,*

28 *Inc.*, 845 A.2d 1031, 1033 (Del. 2004) (holding the issue turns on "(1) who suffered the alleged

24

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1  harm (the corporation or the suing stockholders, individually); and (2) who would receive the

2  benefit of any recovery or other remedy (the corporation or the stockholders, individually?").

3  **V.     Plaintiff has Adequately Pled Defendants Violated Section 20(a)**

4          "Section 20(a) claims are construed liberally and require only some indirect means of

5  discipline or influence short of actual direction to hold a control person liable." *City of St. Clair*

6  *Shores Gen. Emples. Ret. Sys. v. Inland W. Retail Real Estate Tr., Inc.*, 635 F. Supp. 2d 783, 795

7  (N.D. Ill. 2009).  Accordingly, courts routinely conclude that where a plaintiff has adequately pled

8  a Section 14(a) claim, they have also successfully pled a Section 20(a) claim. *Id.* at 796; *Biver v.*

9  *Nicholas Fin., Inc.*, No. 8:14-cv-250-T-33TGW, 2014 U.S. Dist. LEXIS 73933 at *14-15 (M.D.

10  Fla. May 30, 2014) (same); *Robbins & Myers*, 969 F. Supp. 2d at 867 (same); *Hot Topic*, 2014

11  U.S. Dist. LEXIS 180513 at *29-30 (same).  Here, Plaintiff has adequately pled his Section 20(a)

12  claim by alleging that the Individual Defendants held positions of authority on Jaguar's board, and

13  had the ability to control the issuance and contents of the Proxy and could have prevented the

14  material misstatements and omissions alleged.  AC ¶¶ 24, 28, 61-66, 72-77.  Nothing more is

15  required.  *Inland West Retail Real Estate Trust, Inc.*, 635 F. Supp. 2d at 796.

16                                      **CONCLUSION**

17          Defendants repeatedly emphasize that the Proxy was a lengthy document, but they miss

18  the fundamental point at issue - shareholders care about the quality, completeness, and accuracy

19  of the information they receive, particularly management's financial projections, which allow

20  shareholders to assess the fairness of the consideration they are being offered; they are not

21  concerned about the *quantity* of boiler-plate fluff and disclaimers thrown into SEC filings.  *See*

22  *supra*.  Jaguar shareholders were impeded from recognizing the financial unfairness of the

23  Transaction because key valuation information was withheld from them.  The omission of such

24  valuation information rendered the valuation picture portrayed in the Proxy regarding each

25  company and the financial "fairness" of the Transaction incomplete and misleading.

26          For the foregoing reasons, Plaintiff has adequately pled that Defendants violated Sections

27  14(a), 20(a), and Rule 14a-9.  However, in the event the Court finds dismissal is warranted,

28  Plaintiff respectfully requests leave to amend, which is freely granted in securities cases.  *See*

1   *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

2

3   DATED:  April 23, 2018                          Respectfully submitted,

4                                                   */s/ David E. Bower*
                                                    David E. Bower
5
    **MONTEVERDE & ASSOCIATES PC**                  David E. Bower SBN 119546
6   Juan E. Monteverde                              **MONTEVERDE & ASSOCIATES PC**
    The Empire State Building                        600 Corporate Pointe, Suite 1170
7   350 Fifth Avenue, Suite 4405                    Culver City, CA 90230
    New York, New York 10118                        Tel: (213) 446-6652
8   Tel:  212-971-1341                              Fax: (212) 202-7880
    Fax:  212-202-7880                              Email:  dbower@monteverdelaw.com
9   Email: jmonteverde@monteverdelaw.com
                                                    *Counsel for Lead Plaintiff and Lead Counsel*
10                                                  *for the Putative Class*
    *Counsel for Lead Plaintiff and Lead Counsel*
11  *for the Putative Class*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS