1  David E. Bower (SBN 119546)
2  **MONTEVERDE & ASSOCIATES PC**
3  600 Corporate Pointe, Suite 1170
   Culver City, CA 90230
   Tel: (213) 446-6652
4  Fax: (212) 202-7880

5  *Counsel for Lead Plaintiff and*
   *Lead Counsel for the Putative Class*

6

7  **UNITED STATES DISTRICT COURT**
   **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

8  TONY PLANT, Individually and on Behalf        Civil Action No. 3:17-cv-04102-RS
9  of All Others Similarly Situated,
                                                  **SECOND AMENDED**
10                      Plaintiff,                **CLASS ACTION COMPLAINT**

11           v.                                   **DEMAND FOR JURY TRIAL**

12  JAGUAR ANIMAL HEALTH, INC.,                   1.  **VIOLATIONS OF SECTION 14(a) OF**
    JAGUAR HEALTH, INC., JAMES J.                     **THE SECURITIES EXCHANGE ACT**
13  BOCHNOWSKI, LISA CONTE, JOHN                      **OF 1934 AND SEC RULE 14a-9**
    MICEK III, and ARI AZHIR,
14                                                2.  **VIOLATIONS OF SECTION 20(a) OF**
                        Defendants.                   **THE SECURITIES EXCHANGE ACT**
15                                                    **OF 1934**
16

17

18

19       Lead Plaintiff Tony Plant ("Plaintiff"), on behalf of himself and all others similarly

20  situated, by and through his attorneys, alleges the following upon information and belief, including

21  the investigation of counsel and review of publicly-available information, except as to those

22  allegations pertaining to Plaintiff, which are alleged upon personal knowledge.

23                              **SUMMARY OF THE ACTION**

24       1.     This action is brought as a class action by Plaintiff on behalf of himself and the

25  other pre-merger shareholders of Jaguar Animal Health, Inc. ("Jaguar" or the "Company"), except

26  Defendants (defined below) and their affiliates, against Jaguar, its post-merger entity Jaguar

27  Health, Inc. ("Jaguar Health" or the "Combined Company"), and members Jaguar's board of

28
                                              1

directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15.U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, in connection with the merger and certain related transactions (collectively, the "Transaction") between Jaguar and Napo Pharmaceuticals, Inc. ("Napo").

2.      As set forth in greater detail below, on July 6, 2017, the Individual Defendants and Jaguar caused a materially deficient, false and misleading joint proxy statement/prospectus ("Proxy") to be disseminated to Jaguar's shareholders to solicit their votes in favor of the financially unfair Transaction.  The Proxy set the special meeting of Jaguar shareholders to vote on the Transaction for July 27, 2017 (the "Special Meeting").

3.      Rule 14a-9(a) prohibits proxy statements from: (i) containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact; and (ii) omitting any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.  17 C.F.R. § 240.14a-9(a).  Here, the Proxy contained both outright false or misleading statements with respect to material facts, and also omitted material facts which rendered specific statements within the Proxy incomplete and misleading.

4.      Furthermore, when corporate actors voluntarily elect to speak regarding projections and valuation-related information, they assume an obligation to do so in a complete and accurate manner.  When it comes to disclosing projections and valuation information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose incomplete half-truths.  If one speaks on a topic, he is bound not only to state the truth but also not to suppress or conceal any facts within his knowledge which will materially qualify those stated; if he speaks at all, he must make a full and fair disclosure.  This is because the selective disclosure of projections and valuation information is inherently misleading because, by providing only a partial "summary" of projections or valuation analyses, shareholders are unable to properly assess the overall valuation picture of a company or transaction.  Disclosing only a subset of available

financial information, while withholding another subset of distinct financial information that alters the overall valuation picture created by the disclosed numbers, is misleading.

5.     Here, the Proxy contained four categories of statements that were false or misleading with respect to material facts.

*__The False or Misleading Statements Regarding Equilevia as a Prescription Product and the Jaguar Projections That Treated Equilevia as a Prescription Product__*

6.     Three categories of false or misleading statements, while distinct from each other, are related:

(i) Statements identifying one of Jaguar's principal products, Equilevia (a premium product for total gut health in race horses), as a *prescription* product that required expensive clinical trials and was subject to a lengthy and uncertain regulatory approval process by the U.S. Food and Drug Administration ("FDA") before it could hit the market, *e.g.*, Proxy at 38-41, which were false or misleading because Defendants knew that Equilevia was actually going to be marketed and sold as a *non-prescription* product expected to launch in 2017, with a focus on the Middle East market;[1]

(ii) The Jaguar Projections themselves (set forth on page 289 of the Proxy), which were false or misleading because they accounted for Equilevia as a prescription rather than non-prescription product, which in turn had a significant impact on the actual projected numbers because of the significant difference between treating Equilevia as a prescription product subject to several additional years of expensive trials and FDA approval rather than a non-prescription product ready to hit a high-demand market in the Middle East in 2017; and

---

[1] *See* Exhibit 1, Jaguar Health Press Release, *The Merger of Jaguar Animal Health and Napo Pharmaceuticals is Effective*, July 31, 2017 ("Jaguar Health's next expected veterinary product commercial launch will be for Equilevia™, a personalized premium proprietary total gut health product for equine athletes, which will be non-prescription."), https://www.sec.gov/Archives/edgar/data/1585608/000110465917048146/a17-18650_1ex99d1.htm; Exhibit 2, Jaguar Health, Inc., Form S-3, August 4, 2017 at 3 ("Equilevia is our non-prescription product for total gut health in equine athletes. Gut health is important in horses, as colic can cause an otherwise healthy horse to die in a matter of hours. Although we are still assessing the size of this opportunity, we expect to launch sales of Equilevia in the fall of 2017."), https://www.sec.gov/Archives/edgar/data/1585608/000104746917005028/a2232899zs-3.htm.

SECOND AMENDED CLASS ACTION COMPLAINT

(iii) The assertion on page 277 of the Proxy that the Jaguar Projections "were reasonably prepared on the basis reflecting the best currently available estimates and judgments of the management of Jaguar as to the future operating and financial performance of Jaguar…and that they provided a reasonable basis upon which Stifel could form its [Fairness] Opinion," and the similar assertion on page 288 of the Proxy that the Jaguar Projections, "in the view of each party's management, [were] prepared on a reasonable basis, reflects the best available estimates and judgments at the time of preparation, and presents, to the best of management's knowledge and belief at the time of preparation, the expected course of action and the expected future risk adjusted financial performance of each such party," which were false or misleading because *Defendants knew* that the Jaguar Projections *did not* in fact reflect "the best currently available estimates and judgments of the management of Jaguar as to the future operating and financial performance of Jaguar," and *did not* in fact present "the expected course of action and the expected future risk adjusted financial performance" of Jaguar, because the Jaguar Projections accounted for Equilevia as a prescription rather than non-prescription product.

*The Misleading "Summary" of Stifel's Flawed and Unreasonable Discounted Cash Flow Analysis of Jaguar*

7.      The Fourth affirmatively misleading statement was the materially incomplete "summary" of Stifel's Discounted Cash Flow Analysis of Jaguar that appeared on page 286 of the Proxy.  Stifel utilized unreasonable discount rate ranges and perpetuity growth rates in connection with this analysis, which caused the resulting implied equity value for Jaguar of $48 million to $96 million to be significantly lower than Jaguar's actual inherent equity value under a legitimate Discounted Cash Flow Analysis utilizing reasonable assumptions.

8.      Specifically, while Stifel discounted Jaguar's Cash Flow Projections to present value utilizing discount ranges from 16.5% - 21.5% purportedly "based on Jaguar's weighted average cost of capital," Proxy at 286, Bloomberg's estimate of Jaguar's weighted-average cost of capital in the first quarter of 2017 was 8.1%, significantly *below* the discount rate range Stifel

SECOND AMENDED CLASS ACTION COMPLAINT

utilized.  *See infra* ¶ 65.  The higher the discount rate, the lower the resulting implied valuation becomes.  Furthermore, while Stifel "calculated the terminal value of the projected unlevered free cash flow by applying a range of perpetuity growth rates of 1% to 3%, as specified by Jaguar management," Proxy at 286, that growth rate was unreasonably low, and the lower the growth rate, the lower the resulting valuation.  Indeed, the growth rate is significantly lower than the year-to-year growth rate of Jaguar's pretax income, which was significantly higher than 1% to 3% and ranged from 8% to 213%.  *See* Proxy at 289; infra ¶ 66.  Thus, the "summary" of the Jaguar Discounted Cash Flow Analysis misled Jaguar shareholders about the value of their shares.

9.    To perpetuate the deception, the Defendants omitted Jaguar's Cash Flow Projections, the key input in a Discounted Cash Flow Analysis, from the Proxy.  If the Jaguar Cash Flow Projections had been disclosed, Jaguar shareholders would have been able to determine that the implied equity value of Jaguar was higher than the $48 million to $96 million range set forth on page 286 of the Proxy, and that their shares were therefore undervalued in the Transaction.  Without the actual Cash Flow Projections, all Jaguar shareholders were given was a misleading conclusion that the implied equity value for Jaguar was significantly lower than Jaguar's actual intrinsic value.

10.    In sum, Plaintiff alleges that the summary of Stifel's Discounted Cash Flow Analysis for Jaguar on page 286 was an independently false or misleading statement, because it set forth a plainly unreasonable implied equity value for Jaguar, and the Board knew or should have known of the unreasonably low valuation given the unreasonably high discount rates and unreasonably low growth rates that Stifel used.  Plaintiff further alleges that the omission of Jaguar's Cash Flow Projections rendered the summary of Stifel's Discounted Cash Flow Analysis for Jaguar even more misleading than it already was, because without the Jaguar Cash Flow Projections, Jaguar shareholders were unable to appreciate just how off-base the implied equity value for Jaguar was.

11.    As set forth below, Plaintiff also alleges that the omission of both Jaguar's and Napo's Cash Flow Projections rendered the selectively disclosed projections for both companies on pages 289-90 of the Proxy incomplete and misleading.

SECOND AMENDED CLASS ACTION COMPLAINT

*The Material Omissions That Rendered the Summaries of Stifel's Analyses and the Selectively Disclosed Projections Misleadingly Incomplete*

12.     In addition to the above-referenced outright materially false or misleading statements in the Proxy, the Proxy also *omitted* three categories of material financial information bearing directly upon the value of the Jaguar shares held by Plaintiff and the Class and the financial unfairness of the Transaction: (i) the projected unlevered free cash flows that both Jaguar and Napo were expected to generate between 2017 and 2026 (collectively, the "Cash Flow Projections"); (ii) the purportedly "not meaningful" unlevered free cash flow contribution margins for Jaguar and Napo from 2017-2021 that were excised from the unfair summary of Stifel's Contribution Margin Analysis on page 287 of the Proxy (the "Cash Flow Contribution Margins"); and (iii) the pro-forma projections for Jaguar and Napo giving effect to the Transaction (the "Pro Forma Projections"), *see* Proxy at 276.  The omission of these material financial metrics rendered the summaries of Stifel's Discounted Cash Flow Analyses and Contribution Margin Analysis on pages 285-86 of the Proxy materially incomplete and misleading, because the omitted financial metrics were key components of Stifel's analyses that were necessary to understand Stifel's calculations, and their disclosure would have enabled Jaguar shareholders to recognize the unfairness of the Transaction.

13.     The omission of the Cash Flow Projections for both Jaguar and Napo rendered the selectively-disclosed summaries of each company's projections on page 289-90 of the Proxy incomplete and misleading, because the disclosed metrics for revenue, gross profit, income and EBITDA (earnings before interest, taxes, depreciation and amortization) are *materially different* from unlevered free cash flow projections, and under well-settled principles of corporate finance, shareholders' shares should be valued based on a company's projected unlevered free cash flows, not its projected revenues, income, profit or EBITDA.  Disclosing only projections for revenue, profit, income, and EBITDA while simultaneously withholding readily available Cash Flow Projections provides a materially incomplete and misleading overall valuation picture of a company, because of the fundamental differences between unlevered free cash flow and these other financial metrics, elaborated on below.

14.    Additionally, while the Defendants elected to include specific information regarding the pro forma combined condensed financial statements and balance sheets of Jaguar and Napo as if the Transaction had occurred on March 31, 2017 or January 1, 2016, Proxy at 316-323, Defendants inexplicably allowed the Proxy to omit the Pro-Forma Projections for Jaguar and Napo giving effect to the Transaction on a *forward-looking* basis. *See* Proxy at 276. Defendants, by electing to disclose information regarding the pro forma financials of Jaguar and Napo on a *historical*-looking basis, assumed on obligation to disclose the Pro Forma Projections, which would have informed Jaguar shareholders regarding one of the most important issues relevant to their decision—what Jaguar management expected the *Combined Company's projections* to look-like *going forward*, after the consummation of the Transaction.

15.    The misleading Proxy was an essential link in the consummation of the Transaction, as the Transaction could not have been consummated without the affirmative vote of Jaguar's shareholders, which could not have occurred without the Proxy.  The Transaction was fundamentally unfair to Plaintiff and the other pre-Transaction common shareholders of Jaguar. The Merger Consideration (as defined in the Proxy at pages 21-22, 300-301) was excessive and the Transaction was approved by an uninformed shareholder vote.  As a result of the Transaction, Plaintiff and the Class owned only approximately 25% of the outstanding stock of the Combined Company, an unfairly low amount given Jaguar's actual intrinsic value.  Jaguar shareholders' voting power was also significantly reduced as a result of the unfair Merger Consideration.

16.    For these reasons, elaborated on below, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9.  Plaintiff seeks to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act, and SEC Rule 14a-9.

18.    Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either

SECOND AMENDED CLASS ACTION COMPLAINT

1    present in this District for jurisdictional purposes or has sufficient minimum contacts with this

2    District as to render the exercise of jurisdiction over each Defendant by this Court permissible

3    under traditional notions of fair play and substantial justice.

4        19.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. §

5    78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an

6    effect in this District; (ii) Jaguar maintains its principal place of business in this District and each

7    of the Individual Defendants, and other Company officers or directors, either reside in this District

8    or has extensive contacts within this District; (iii) a substantial portion of the transactions and

9    wrongs complained of herein occurred in this District; (iv) most of the relevant documents

10   pertaining to Plaintiff's claims are stored (electronically and otherwise) and evidence exists in this

11   District; and (v) Defendants have received substantial compensation in this District by doing

12   business here and engaging in numerous activities that had an effect in this District.

13                                      **PARTIES**

14        20.      Plaintiff was, at all relevant times, the owner of Jaguar common stock and held

15   such stock since prior to the wrongs complained of herein.

16        21.      Defendant Jaguar was a Delaware corporation with its principle executive offices

17   located at 201 Mission Street, Suite 2375, San Francisco, California 94105.  Jaguar's common

18   stock traded on the NASDAQ under the symbol "JAGX".   The Company was a majority-owned

19   subsidiary of Napo until May 18, 2015, the date of the Company's initial public offering.

20        22.      Jaguar Health, Inc. is the Combined Company that was created as a result of the

21   Transaction, and currently trades on the NASDAQ under the symbol "JAGX".

22        23.      Individual Defendant Lisa A. Conte served as Jaguar's President, Chief Executive

23   Officer and a member of the Company's Board since she founded the Company in June 2013.

24   From 2001 to 2014, Ms. Conte served as the Chief Executive Officer of Napo, which she founded

25   in November 2001.  Additionally, at all relevant times, Ms. Conte served as Napo's Interim Chief

26   Executive Officer and had served as a member of its board of directors since 2001.  In other words,

27   Ms. Conte stood on both sides of the Transaction.  Ms. Conte holds an M.S. in Physiology and

28   Pharmacology from the University of California, San Diego, and an M.B.A. and A.B. in

SECOND AMENDED CLASS ACTION COMPLAINT

1  Biochemistry from Dartmouth College.  The Company's directors and officers believed that Ms.
2  Conte was qualified to serve on the Board due to her extensive knowledge of the Company and
3  experience with its product and product candidates, as well as her experience managing and raising
4  capital for public and private companies.

5        24.    Individual Defendant James J. Bochnowski was, at all relevant times, a director of
6  Jaguar and was the Chairman of the Board.  He is the current Chairman of the Board for Jaguar
7  Health.  Mr. Bochnowski served as a member of the Board since February 2014, and as
8  Chairperson of the Board since June 2014.  Since 1988, Mr. Bochnowski has served as the founder
9  and Managing Member of Delphi Ventures, a venture capital firm.  In 1980, Mr. Bochnowski co-
10 founded Technology Venture Investors.  Mr. Bochnowski holds an M.B.A. from Harvard
11 University Graduate School of Business and a B.S. in Aeronautics and Astronautics from
12 Massachusetts Institute of Technology.  The Company's directors and officers believed that Mr.
13 Bochnowski was qualified to serve on the Board due to his significant experience with venture
14 capital backed healthcare companies and experience as both an executive officer and member of
15 the board of directors of numerous companies.

16       25.    Individual Defendant John Micek III was, at all relevant times, a director of the
17 Company.  Mr. Micek served as a member of the Company's Board since April 2016.  From 2000
18 to 2010, Mr. Micek was managing director of Silicon Prairie Partners, LP, a Palo Alto, California
19 based family-owned venture fund.  Since 2010, Mr. Micek has been managing partner of Verdant
20 Ventures, a merchant bank dedicated to sourcing and funding university and corporate laboratory
21 spinouts in areas including pharmaceuticals and cleantech. Mr. Micek serves on the board of
22 directors of Armanino Foods of Distinction, Innovare Corporation and JAL/Universal Assurors.
23 He is also a board member and the Chief Executive Officer and Chief Financial Officer of Enovo
24 Systems and from March 2014 to August 2015 he served as interim Chief Financial Officer for
25 Smith Electric Vehicles, Inc. Mr. Micek is a cum laude graduate of Santa Clara University and the
26 University of San Francisco School of Law.  The Company's directors and officers believed that
27 Mr. Micek was qualified to serve on the Board due to his many years of executive experience in
28 management and on boards of director.

9

SECOND AMENDED CLASS ACTION COMPLAINT

1    26.    Individual Defendant Ari Azhir was, at all relevant times, a director of the

2  Company. Dr. Azhir served as a member of the Company's Board since December 2016.

3  Dr. Azhir is an entrepreneur and founder and CEO of two companies focused on central nervous

4  system (CNS) therapeutics: Neuraltus Pharmaceuticals and Neurocea LLC.   She has broad

5  experience launching and building life science companies and has successfully commercialized

6  and brought more than 20 healthcare products to market, ranging from small molecule

7  pharmaceuticals for CNS and dermatology to disruptive technologies in medical devices.  These

8  technologies include flow cytometry products at Becton Dickinson and ultrasound devices at

9  Accuson, where she held executive management positions.  Dr. Azhir has wide-ranging drug

10  development experience.  She also has extensive experience building strong patent portfolios and

11  is the key inventor and patent holder of 12 patents.  She serves on the translational research board

12  of UCSF and has served on private boards (Polar Springs and Neuraltus), as well as nonprofit

13  boards (The Hearing Society and American Women in Science).  Dr. Azhir received her B.SC in

14  Biochemistry and Mathematics, as well as her M.Ph. in Biophysics, from Kings' College, London

15  University, and received a PhD. in Biophysics from Tehran University.  The Company's directors

16  and officers believed that Dr. Azhir was qualified to serve on the Board due to her many years of

17  executive experience in management and on boards of director and her human heath experience.

18    27.    The defendants identified in paragraphs 21-26 are collectively referred to as the

19  "Defendants".

20              **FURTHER SUBSTANTIVE ALLEGATIONS**

21  **A.    Neither The Defendants' Nor Stifel's Interests Were Aligned With The Interests
22        of Jaguar's Public Shareholders**

23    28.    Jaguar is an animal health company focused on developing and commercializing

24  gastrointestinal products for companion and production animals, foals, and horses.  The Proxy

25  informed Jaguar shareholders that the Company was substantially dependent on the success of

26  three products: Equilevia, Canalevia and Neonorm.  Proxy at 40.  Two of the products, Equilevia

27  and Canalevia, were described throughout the Proxy as "*prescription* drug product candidates,"

28  while Neonorm was a non-prescription product.  Proxy at 38-41, 95, 98.

SECOND AMENDED CLASS ACTION COMPLAINT

29.     Napo is a pharmaceutical company focused on the development and commercialization of Mytesi, a human drug approved by the FDA for the symptomatic relief of noninfectious diarrhea in adults with HIV/AIDS.

30.     In June 2013, Napo formed Jaguar to develop and commercialize animal health products.  Jaguar was a majority-owned subsidiary of Napo until the close of Jaguar's initial public offering in 2015.  Despite their technically "separate" corporate identities after Jaguar's initial public offering, both companies and their leadership remained intricately linked together.  The companies shared a headquarters in San Francisco, California, and Individual Defendant Lisa Conte was the founder of and served as the Chief Executive Officer of both companies.

31.     Two of the Individual Defendants, Lisa Conte and James J. Bochnoski, held shares in Napo.  Bochnowski, who served as Chairman of the Jaguar board of directors, beneficially owned approximately 6.5% of Napo's outstanding stock, and Conte beneficially owned approximately 1.3% of Napo's outstanding stock.

32.     Certain other unidentified members of Jaguar's board of directors, as well as certain of Jaguar's executive officers and employees, also beneficially owned common stock in Napo.  As a group, Jaguar executive officers and directors collectively beneficially owned 9.8% of the issued and outstanding common stock of Napo.

33.     Furthermore, a majority of Jaguar's directors and named executive officers only owned small amounts of Jaguar's common stock, and their financial interests were thus not aligned with the Company's public shareholders.

34.     Following the consummation of the Transaction, the Combined Company's directors consisted of the seven members of Jaguar's board of directors: James J. Bochnowski, Lisa A. Conte, Folkert W. Kamphuis, Jiahao Qiu, Zhi Yang, Ph.D, John Micek III and Ari Azhir.  Furthermore, Ms. Conte kept her lucrative job as Chief Executive Officer of the Combined Company.  In other words, all of Jaguar's directors were ensured that they would maintain their positions with the post-Transaction Combined Company.

35.     Additionally, two other Jaguar executive officers were ensured they would maintain their lucrative positions with the post-Transaction Combined Company.  Steven R. King,

11

who served as Jaguar's Executive Vice President of Sustainable Supply, Ethnobotanical Research and Intellectual Property since March 2014, maintained his position as an executive officer of the Combined Company.   From 2002 to 2014, Dr. King served as the Senior Vice President of Sustainable Supply, Ethnobotanical Research and Intellectual Property at Napo.   Prior to that, Dr. King served as the Vice President of Ethnobotany and Conservation at Shaman Pharmaceuticals, Inc, a company Ms. Conte founded in 1989.   In other words, Dr. King and Ms. Conte had long-standing ties to each other and had worked together for many years.   And Karen S. Wright, who served as Jaguar's Chief Financial Officer since December 2015, also kept her lucrative position with the Combined Company.

36.   Furthermore, the Transaction was structured so that in addition to Jaguar shares being issued to Napo shareholders, Jaguar shares were also issued to certain Napo creditors in order to satisfy Napo's indebtedness, and an existing Napo stockholder was issued Jaguar shares in exchange for agreeing to invest $3 million of new funds that were to be immediately loaned to Napo to further facilitate the extinguishment of Napo's debt.   As Napo's Chief Executive Officer, Individual Defendant Conte was undoubtedly concerned with reducing Napo's debt, and she used the Transaction as the mechanism to do so, at the expense of Jaguar's public shareholders.   The specific aspects of the Transaction related to paying off Napo's debt required the approval of Jaguar's shareholders.   In other words, Ms. Conte needed to ensure she had the support of Jaguar's shareholders in order to facilitate the Transaction, whereby she would simultaneously keep her lucrative positions as Chief Executive Officer and a director of the Combined Company and would also simultaneously significantly reduce Napo's debt.

37.   Additionally, Ms. Conte held restricted stock units (RSUs) for an aggregate of 10,474,783 shares of Napo common stock (3,475,734 of which were issued prior to 2011, and 6,999,049 of which were issued in 2011 or later), and Dr. King held RSUs for an aggregate of 2,042,098 shares of Napo common stock (1,073,273 of which were issued prior to 2011, and 968,825 of which were issued in 2011 or later).   The RSUs issued prior to 2011 were set to vest upon the consummation of the Transaction, while the RSUs issued in 2011 or later would only

SECOND AMENDED CLASS ACTION COMPLAINT

1    vest upon consummation of the Transaction *and* the repayment of Napo's debt.  Therefore, it was

2    not a coincidence that the repayment of Napo's debt was such an important part of the Transaction.

3         38.    Furthermore, prior to the signing of the Merger Agreement, Jaguar already had an

4    exclusive worldwide license to Napo's intellectual property rights and technology related to

5    Jaguar's products and product candidates, including rights to its library of over 2,300 medicinal

6    plants, for all veterinary treatment uses and indications for all species of animals.  And in January

7    2014, Jaguar entered into a license agreement with Napo, which we amended and restated in

8    August 2014 and further amended in January 2015, pursuant to which Jaguar acquired an

9    exclusive, sublicensable, transferable, worldwide license to certain intellectual property rights of

10   Napo and its affiliates to research, develop, formulate, make, use, market, sell, and import, and to

11   otherwise exploit products of Napo and its other affiliates for all veterinary treatment uses and

12   indications for all species of animals.  In consideration for the license, Jaguar agreed to pay Napo

13   a license fee of $1.75 million, which was paid as of 2016.  Given that Jaguar had already contracted

14   with Napo to its benefit prior to the Transaction, the Transaction was intended to benefit Napo's

15   stakeholders, at the expense of Jaguar's public shareholders.

16        39.    Additionally, Napo was Jaguar's largest stockholder, and its interests conflicted

17   with those of the Company's other public shareholders.  At the time of the Special Meeting, Napo

18   owned approximately 15.3% of Jaguar's common stock.  This concentration of ownership gave

19   Napo significant influence over the Board and the way Jaguar was managed.  In addition, because

20   Jaguar and Napo were parties to a license agreement, Napo's interests as the licensor of Jaguar's

21   technology were different from those of  Jaguar's other stockholders.  As a result, the interests of

22   Napo with respect to matters such as acquisitions, licenses, financings and other corporate

23   opportunities conflicted with the interests of Jaguar's other stockholders.  In addition, because

24   Jaguar's Chief Executive Officer, Ms. Conte, was also the interim chief executive officer of Napo,

25   her duties as interim chief executive officer of Napo conflicted with her duties as the Chief

26   Executive Officer of Jaguar.

27        40.    Simply stated, the interest of the Individual Defendants and other Jaguar executive

28   officers and directors were not aligned with the interests of Plaintiff and the Class.

SECOND AMENDED CLASS ACTION COMPLAINT

41.     On March 31, 2017, the Board approved the extraordinarily complex Merger Agreement whereby Jaguar and Napo would merge, each of Jaguar's directors and three of its executive officers would maintain their positions with the post-merger Combined Company, and Napo would emerge in a much stronger financial position, at the expense of Jaguar's public shareholders.

42.     Pursuant to the terms of the Merger Agreement: (i) each issued and outstanding share of Napo common stock (other than dissenting shares and shares held by Jaguar or Napo) was converted into a contingent right to receive (x) up to a whole number of shares of Jaguar common stock comprising in the aggregate up to approximately 20.2% of the fully diluted shares of Jaguar common stock immediately following the consummation of the merger, which contingent right vested only if the resale of certain shares of Jaguar common stock (referred to as Tranche A shares) issued by Jaguar to Nantucket Investments Limited pursuant to the Napo debt settlement provides Nantucket with specified cash returns over a specified period of time (sometimes referred to herein as the Hurdle Amounts), and (y) if the applicable Hurdle Amount was achieved before all of the Tranche A Shares were sold, additional shares of the Jaguar common stock (equal to 50% of the unsold Tranche A Shares), were distributed pro rata among holders of contingent rights and holders of Napo restricted stock units, (ii) existing creditors of Napo (inclusive of Nantucket) were issued in the aggregate approximately 42,957,072 shares of Jaguar non-voting common stock and 2,282,445 shares of Jaguar voting common stock in full satisfaction of all existing indebtedness then owed by Napo to such creditors, and (iii) an existing Napo stockholder (referred to as Invesco) was issued an aggregate of approximately 3,243,243 shares of Jaguar common stock in return for $3 million of new funds invested into Jaguar by such investor, which was immediately loaned to Napo to partially facilitate the extinguishment of the debt that Napo owed to Nantucket. Additionally, Jaguar assumed (i) each outstanding and unexercised option to purchase Napo common stock, which was converted into options to purchase Jaguar common stock, (ii) each outstanding warrant to purchase Napo common stock, which was converted into warrants to purchase Jaguar common stock, and (iii) each outstanding restricted stock unit to acquire Napo

SECOND AMENDED CLASS ACTION COMPLAINT

common stock, which was converted into restricted stock units to acquire Jaguar common stock (collectively, the "Merger Consideration").

43. This type of transaction is typically referred to as a reverse merger, whereby a larger private company merges "into" a much smaller publicly traded company to bypass the IPO underwriting process, but maintains control of the majority of the shares in the post-merger combined company. The structure of the Transaction evinces that this deal was meant to benefit an overleveraged Napo, its stakeholders, and the Individual Defendants, not Jaguar's public shareholders.

44. The Jaguar Board retained Stifel as its financial advisor to provide a so-called "fairness opinion" regarding the purported financial fairness of the Transaction to Jaguar stockholders. Fairness opinions have become a ubiquitous part of corporate deal making. *See* Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1560 (Aug. 2006). The fairness opinion process is plagued by conflicts of interest, as has been noted by leading scholars and courts alike. As one scholar explained:

> [C]urrent fairness opinion practice is still deeply flawed. Fairness opinions, and their underlying valuation analyses, are prone to subjectivity and are frequently prepared utilizing methodologies that simply do not jibe with best practices. These defects are exacerbated by the recurring problem of investment banks who are conflicted in their provision of fairness opinions…The typical issuers of fairness opinions, investment banks, have been subject to repeated criticism for potential and actual conflicts in the rendering of these opinions. The primary issue is this: investment banks delivering fairness opinions in a corporate control transaction typically are also retained to render general financial advice with respect to the relevant transaction. They are well-compensated for this work. The fee can be millions of dollars: the amount variant depending upon the transaction size. The manner of compensation is a success fee payable to the bank at transaction milestones such as announcement or completion. The compensation for a fairness opinion is often subsumed into this larger fee and is therefore also dependent upon the transaction's occurrence. The investment bank therefore has a hefty incentive to ensure that the contemplated transaction for which it will issue a fairness opinion progresses to completion. But, conflict arises where a bank is asked to opine and advise on a transaction that it stands to benefit from only if the transaction transpires. In fact, under the fee structure explicated above the bank

SECOND AMENDED CLASS ACTION COMPLAINT

will not be paid if it cannot find fairness. This charge can be made even if the fairness opinion compensation is paid separate from the larger success fee. If the transaction occurs, the remaining overall compensation is significant enough to raise conflict issues.

This explicit conflict is also accompanied by a more subtle one. The relationships between investment banks and corporate management can run deep, and an investment bank often has business with the corporation and its management that span more than one transaction. In these situations, investment banks may be influenced to find a transaction fair to avoid irritating management and other corporate actors who stand to benefit from the transaction. This will ensure future lucrative business.

Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. at 1562, 1586-87.

45.    Here, Jaguar's financial advisor Stifel faced such conflicts.  Specifically, Stifel was paid $1,000,000 for its opinion, including $250,000 that was expressly contingent upon the approval of the Transaction by Jaguar shareholders.  The remaining $750,000, although technically "earned" upon the delivery of the fairness opinion, was for all intents and purposes contingent upon a finding of fairness.  Simply put, bankers know they are not retained and paid large sums of money to provide "unfairness" opinions—which is why no such thing exists.  As one court explained, it is problematic "that only a positive fairness opinion can be rendered.  It is worth noting…that when asked by this Court if any of assembled counsel were aware of any fairness opinion that opined that a proposed transaction was in fact unfair, the response was a resounding "NEVER."  *Matter of N.Y. Stock Exch.*, 2005 NY Slip Op 52308(U), 12 Misc. 3d 1184(A), 824 N.Y.S.2d 764 (NY Sup. Ct. Dec. 5, 2005).  Furthermore, the Proxy noted that Stifel may seek to provide investment banking or financial advisory services to Jaguar or its affiliates in the future, for which Stifel would seek customary compensation.  Stifel knew it would not be retained to provide future services to the Jaguar Board and management if it was unwilling to deem the Transaction that these individuals strongly desired "fair".

46.    To support their fairness opinions, financial advisors perform several types of valuation analyses.  Here, Stifel performed a Selected Publicly Traded Companies Analysis, Selected Precedent Transactions Analysis, Discounted Cash Flow Analysis, and Contribution Margin Analysis.  *See* Proxy at 280-87.  Each of these analyses are highly subjective and prone to

16

manipulation to ensure the desired outcome—that the merger consideration and transaction at issue appear "fair" to shareholders.  As Professor Davidoff explained:

> A fairness opinion's worth ultimately lies in the reliability and accuracy of its underlying valuation analyses. This is the realm of finance - and academics have made significant strides in the previous decades to develop techniques by which a theoretically reliable range of values can be achieved. However, there is still an element of subjectivity present in the choice and application of these methods. **The end-result is to provide the preparer discretion to effect the outcome of a valuation and a diminished ability for outsiders to make comparative assessments of analyses**.
>
> There are a number of different underlying valuation analyses upon which a fairness opinion can rest. The most common and accepted techniques are discounted cash flow, comparable companies, premium, break-up, and liquidation analysis. The preparer of a fairness opinion will typically utilize a weighted combination of these to arrive at a fairness conclusion. The choice of a particular analysis to employ and the weight given to each is partially subjective and depends upon the asset being valued and the relevant circumstances. **For example, in the corporate control transaction paradigm the most important analysis is, absent unusual circumstances, the discounted cash flow calculus**. However, in the investment banking community, there are no uniform, specific, and objective guidelines as to the exact mix and weight to assign to each of these methods to arrive at fairness.
>
> Each of the techniques in and of themselves is also prone to subjectivity. **For example, a discounted cash flow analysis is conducted by discounting back at a chosen discount rate the projected future free cash flows and terminal value of an asset. In performing this analysis there are three central choices, which must be made, each of which can significantly affect the final valuation. These are the correct forecasted free cash flows to utilize, the appropriate discount rate, and the terminal value of the asset. There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars**. However, again there is no standard-setting or other body guiding these or other preparation decisions. Rather, a discounted cash flow analysis, like other valuation analyses, is typically compiled using historically developed and unguided industry practices as influenced and first put forth by academic practitioners. This lends itself to differences in valuation approach

SECOND AMENDED CLASS ACTION COMPLAINT

in each application and among institutions as each of them develops their own individual approach. This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques.

**This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.** This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. at 1573-78.

47.     Here, as set forth above, Stifel's Discounted Cash Flow Analysis of Jaguar was flawed, unreasonable and designed to justify a predetermined outcome—an appearance of fairness. The summary of the analysis itself was misleading, because the analysis utilized unreasonable discount rates and growth rates to drive down the resulting implied equity value for Jaguar. Defendants then omitted the actual Jaguar Cash Flow Projections from the Proxy, the most critical financial metric necessary for shareholders to assess the fairness of the Transaction, and thereby impeded Jaguar shareholders from appreciating just how off-base the implied equity value for Jaguar set forth on page 286 of the Proxy was.

48.     Simply stated, one cannot properly assess the legitimacy or lack thereof of a financial advisor's fairness opinion valuation analyses unless the key financial metrics and inputs associated with the analyses are disclosed.   Here, the Defendants allowed the Proxy to incompletely and misleadingly selectively "summarize" Stifel's valuation analyses.   The summaries of Stifel's Discounted Cash Flow and Contribution Margin analyses on pages 285-86 of the Proxy were materially incomplete and misleading, because they failed to disclose certain key inputs and valuation metrics that were necessary for Jaguar shareholders to fully recognize the illegitimacy of the analyses and the resulting implied equity values and implied ownership ratios.

49.     Furthermore, the Defendants elected to disclose certain projections for Jaguar and Napo on pages 289-90 of the Proxy, but they nevertheless elected to withhold the most important

SECOND AMENDED CLASS ACTION COMPLAINT

projections, the Free Cash Flow Projections.  The selectively-disclosed projections on pages 289-90 of the Proxy provided an incomplete and misleading valuation picture of Jaguar and Napo, because Free Cash Flow Projections are necessary for shareholders to properly assess the value of companies, and the disclosed financial metrics—revenue, income, profit, and EBITDA—each differ in material ways from Free Cash Flow and are insufficient alternatives for purposes of assessing the value of companies and stock.  *See infra.*

**B.    The Proxy Was Materially Incomplete, False and Misleading**

50.    On July 6, 2017, Jaguar filed the Proxy with the SEC in connection with the Transaction, and it was mailed to Jaguar stockholders on or about July 7, 2017.  The Proxy solicited the Company's shareholders to vote in favor of the Transaction.  Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, in violation of Rule 14a-9, the Proxy contained both statements that were independently false or misleading with respect to material facts, and also omitted material facts that were necessary in order to make specific statements and sections of the Proxy not false or misleading.

*The Statements That Were False or Misleading With Respect to Material Facts*

51.    *First*, numerous pages in the Proxy contained false or misleading statements identifying one of Jaguar's principal products, Equilevia (a premium product for total gut health in race horses), as a *prescription* product that required expensive clinical trials and was subject to a lengthy and uncertain regulatory approval process by the FDA before it could hit the market.  Indeed, the Proxy made numerous references to the risks associated with Equilevia as a *prescription* product, including that "Jaguar expects to incur significant additional costs as it…undertakes the clinical trials necessary to obtain regulatory approvals for…Equilevia, which will increase Jaguar's losses," and that "[t]he successful development and commercialization of…Equilevia…will depend on a number of factors, including….Jaguar's ability to demonstrate to the satisfaction of the FDA and any other regulatory bodies, the safety and efficacy of Equilevia…"  Proxy at 38, 41.  However, on July 31, 2017, *a mere four days after Jaguar shareholders voted to approve the Merger*, Jaguar disclosed that Equilevia was going to be

Jaguar's "*next* expected veterinary product commercial launch" as a *non-prescription product that would be ready to hit the market in 2017*.  *See* Exhibit 1.  In other words, the Proxy materially misrepresented the business plan regarding one of Jaguar's most important products, including with the following false or misleading statements:

- "Jaguar expects to incur significant additional costs as it continues commercialization efforts for Neonorm, and undertakes the clinical trials necessary to obtain regulatory approvals for Canalevia and Equilevia, which will increase Jaguar's losses." (Proxy at 38);

- "Jaguar will also need to conduct clinical trials for Equilevia and Canalevia in order to obtain necessary initial regulatory approvals…" (Proxy at 38);

- "Jaguar currently does not have regulatory approval for any of its prescription drug product candidates, including Equilevia and Canalevia." (Proxy at 40);

- "The successful development and commercialization of Neonorm and, if approved, Equilevia and Canalevia will depend on a number of factors, including the following:…Jaguar's ability to demonstrate to the satisfaction of the FDA and any other regulatory bodies, the safety and efficacy of Equilevia and Canalevia." (Proxy at 41); and

- The chart on page 98 of the Proxy, identifying Equilevia as a "Prescription Drug Product Candidate."

52.    The statements in the Proxy that identified Equilevia as a prescription product subject to an expensive and uncertain FDA approval process were therefore "false or misleading with respect to a[] material fact material"—that is, they were false or misleading with respect to whether one of Jaguar's most important products was going to be developed, marketed and sold as a prescription or non-prescription product.  Whether Equilevia was going to be a prescription product subject to an expensive, lengthy, and uncertain FDA approval process or, instead, a non-prescription product ready to hit a promising Middle East market in 2017 was clearly material information to Jaguar's shareholders.

53.    ***Second***, page 289 of the Proxy contained certain financial projections for Jaguar for the years 2017 through 2026, defined in the Proxy and referred to herein as the "Jaguar Projections."  A company's financial projections are material to shareholders faced with deciding

SECOND AMENDED CLASS ACTION COMPLAINT

1  whether to vote for a complex business combination. However, the Jaguar Projections were false
2  or misleading because, upon information and belief, they reflected Equilevia being developed as a
3  *prescription* product, when in fact, Defendants knew that Equilevia would be marketed and sold
4  as a *non-prescription* product. Plaintiff's belief that the Jaguar Projections accounted for Equilevia
5  as a prescription rather than a non-prescription product is founded upon the fact that the Proxy
6  itself falsely or misleadingly stated that Equilevia was being developed as a prescription product
7  even though it was not (Proxy at 38-41, 98), and that page 288 of the Proxy states that the Jaguar
8  Projections reflected various assumptions including that "*regulatory approval* of products for new
9  markets, would be successfully executed," and further states that "clinical trial results and
10  regulatory approval [were] out of the companies' control." Proxy at 288. These statements suggest
11  that the Jaguar Projections accounted for Equilevia as a *prescription* product, with all the
12  associated significant expenses of conducting trials and obtaining FDA regulatory approval,
13  despite the fact that Defendants knew at the time the Proxy was prepared and as of the date of the
14  Special Meeting that Equilevia was going to be marketed and sold as a *non-prescription* product
15  in a promising Middle East market beginning in 2017.

16       54.    Jaguar's projections that were specifically tied to Equilevia's prospects and
17  projected sales undoubtedly had a significant impact on the overall Jaguar Projections for the entire
18  Company. Indeed, the Proxy notes that "Jaguar is substantially dependent on the success of
19  Equilevia…" and Equilevia was one of Jaguar's three principal products. Proxy at 40. Thus, the
20  Jaguar Projections, which accounted for Equilevia as a prescription rather than non-prescription
21  product, provided an inherently false or misleading valuation picture of Jaguar because, by treating
22  Equilevia as a prescription product subject to a lengthy and expensive trial and FDA approval
23  process, the Jaguar Projections failed to account for the reality at the time the Merger was
24  approved—that Equilevia would be marketed and sold as a non-prescription product, expected to
25  hit a strong Middle East market in 2017. Simply stated, by accounting for Equilevia as a
26  prescription rather than a non-prescription product, the Jaguar Projections provided a materially
27  false and misleading picture regarding Jaguar's expected financial prospects. In other words, the
28  Jaguar Projections on page 289 of the Proxy were themselves false or misleading with respect to

21

the Company's future financial performance, because they treated Equilevia as a prescription product subject to a lengthy and expensive regulatory approval process, when Defendants in fact knew that Equilevia was going to be marketed and sold as a non-prescription product that could hit the promising Middle East market in 2017.

55.    Defendants undoubtedly knew that Equilevia was going to be marketed and sold as a non-prescription rather than prescription product prior to July 27, 2017, the date Defendants set the Special Meeting for Jaguar shareholders to vote on the Transaction.  Indeed, it defies credulity to believe that the idea to make such a significant change—that is, to switch one of the Company's three primary products from prescription to non-prescription—occurred for the first time and was finalized during the four day period between July 27, 2017 (the date of the Special Meeting) and July 31, 2017 (the date Jaguar issued a press release announcing that Equilevia would be a non-prescription product and the Company's "next veterinary product commercial launch").  Surely, the idea to switch Equilevia from prescription to non-prescription first emerged sometime before July 27, 2017.  Such a drastic change regarding the business plan for a company's premier product is not whimsically made over the course of a few days.  Indeed, Defendants likely knew about the plan to switch Equilevia from a prescription product to a non-prescription product months prior to the Special Meeting (July 27, 2017) and the date the Proxy was disseminated (July 6, 2017).

56.    In addition to the sheer timing of the announcement, which indicates that the Defendants must have known of the plan to market and sell Equilevia as a non-prescription product *before* the Proxy was issued and shareholders voted on the Merger, certain comments by Individual Defendant Lisa Conte, the Chief Executive Officer of both Jaguar and Napo, further suggest that she and the other Individual Defendants knew of such a plan before the shareholder vote.

57.    Specifically, Jaguar's SEC filing from September 18, 2017 (one and a half months after the Special Meeting) cites the particularly strong demand for a "total gut health" product for high performance race horses *in the Middle East* as a primary reason why Equilevia was better off being marketed and sold as a non-prescription product.[2]  Of course, approval by the U.S. FDA is

---

[2] *See* Jaguar Health, Inc., Form 424B3 Prospectus, September 18, 2017 ("The equine athlete business continues to be a major focus area for the animal health side of our business. The demand,

SECOND AMENDED CLASS ACTION COMPLAINT

irrelevant if a product is going to be primarily marketed and sold in the Middle East.  Surely, the Individual Defendants, who were highly knowledgeable about this business area, did not first learn of this "quite strong" demand in the Middle East for such a product sometime between the date of the Special Meeting and September 18, 2017.  Indeed, a press release from December 14, 2017 announcing that Jaguar entered into a collaboration agreement for Equilevia with SEED Mena Businessmen Services LLC, an entity based in Dubai, further suggests that Individual Defendant Lisa Conte was quite familiar with the demand for a total gut health product for horses in the Middle East.   In the press release, Ms. Conte is quoted as explaining how this demand was "**originally identified**" by her colleague Dr. Mike Hauser, Jaguar's former chief veterinarian who passed away in August 2015 and was the former head of the world-renowned Dubai Equine Hospital.  As Ms. Conte stated:

> The need for a personalized, premium product for total gut health in equine athletes **was originally identified by the late Dr. Mike Hauser**—Jaguar's former chief veterinarian and the former head of the world-renowned Dubai Equine Hospital…**Mike had an intimate understanding of the training conditions and value of equine health in the UAE, and he is frequently credited with being the primary force behind bringing leading-edge equine medicine and surgery to the Middle East**. We're very excited about a new potential approach for total gut health in competitive horses—and about our new partnership with SEED—and in the UAE region we plan to focus initial sales and collaborative efforts on particular stables, tailored to the particular equine husbandry practices of specific organizations and even individual high-end equine athletes. The terms of the Agreement reflect the financial impact we expect Equilevia to have on Jaguar's business, with potentially hundreds to thousands of horses treated regularly to

particularly in the Middle East, for a 'total gut health' product for high performance equine athletes appears to be quite strong, and we believe this is indicative of an unmet medical need. Based on this demand, and with support from studies we conducted in horses with gastric ulcers—a prevalent problem in competing horses—and also horses with diarrhea, we have transitioned development of Equilevia to a create a non-prescription, personalized, premium proprietary product for total gut health in equine athletes. Gut health is of critical importance in horses, as conditions such as colic can lead to the death of an otherwise healthy horse in a matter of hours. Although we are still assessing the size of the opportunity represented by this self-funded program, we expect to begin generating revenue from the sale of Equilevia in the fourth quarter of 2017."), https://www.sec.gov/Archives/edgar/data/1585608/000104746917005913/0001047469-17-005913-index.htm

23

maintain wellness. We're so pleased to have entered a collaboration intended to supplement our commercial human pharmaceutical business with a product designed for the most venerable participants in the sport of kings.[3]

58.      In sum, Ms. Conte's pre-Transaction knowledge regarding the animal health products market and demand for a total gut health product in the Middle East, as well as her dual role as both Jaguar's and Napo's CEO, all support the inference that the Individual Defendants and other members of Jaguar management had developed and/or knew of the idea to market Equilevia as a non-prescription rather than prescription product in the Middle East *before* the Proxy was disseminated and the Special Meeting was held. **And, most glaringly, the fact that Jaguar announced that Equilevia would be marketed as a non-prescription product and would be the Company's "next veterinary product commercial launch" a mere four days after the Special Meeting leaves no reasonable doubt that the Individual Defendants knew of this significant change regarding the business plan for Equilevia** *before* **the Special Meeting and the dissemination of the Proxy**.

59.      The Proxy further indicates that treating Equilevia as a prescription rather than non-prescription product must have had a significant impact on the overall Jaguar Projections.  Indeed, the Company stated it expected "to incur significant additional costs as it…undertakes the clinical trials necessary to obtain regulatory approvals for Canalevia and Equilevia, which will increase our losses."  Proxy at 38.  In other words, the Jaguar Projections assumed "significant additional costs" and losses associated with developing Equilevia as prescription product, when, a mere *four days* after the Merger was approved by shareholders, the Company announced that Equilevia would in fact be sold as a non-prescription product targeting the Middle East market, and thus it did not need to undergo the significantly expensive clinical trials necessary to obtain FDA regulatory approval in order to be sold in that market, and would in fact be ready to hit the promising Middle East market and generate meaningful revenues much more quickly.  Further, *as*

---

[3] Jaguar Health, News Release, *Jaguar Health and Dubai-based Seed Mena Enter Collaboration Agreement for Equilevia, Jaguar's Personalized, Premium Product for Total Gut Health and Wellness in Horses* (Dec. 14, 2017), https://jaguarhealth.gcs-web.com/news-releases/news-release-details/jaguar-health-and-dubai-based-seed-mena-enter-collaboration

SECOND AMENDED CLASS ACTION COMPLAINT

*a prescription product*, Equilevia was not expected to be ready for a new animal drug application or "NADA" until the second half of 2019.  Thus, by treating Equilevia as a prescription rather than non-prescription product, the Jaguar Projections materially mispresented the future prospects of the Company.  Indeed, rather than being a prescription product that needed to undergo a lengthy and expensive FDA regulatory approval process in order to be sold, Equilevia was in fact being prepared to be marketed and sold as a non-prescription product ready to hit the Middle East market and generate revenues by the fourth quarter of 2017.  And the prospects of Equilevia as a non-prescription product were and continue to be quite strong.

60.   ***Third,*** and relatedly to the two above-referenced false or misleading statements, the Proxy in two instances asserted that the Jaguar Projections reflected management's best estimates and judgments regarding the future financial performance of Jaguar.  First, page 277 of the Proxy stated that the Jaguar Projections "were reasonably prepared on the basis reflecting the best currently available estimates and judgments of the management of Jaguar as to the future operating and financial performance of Jaguar…and that they provided a reasonable basis upon which Stifel could form its Opinion," and page 288 of the Proxy contained a similar assertion that the Jaguar Projections, "in the view of each party's management, [were] prepared on a reasonable basis, reflects the best available estimates and judgments at the time of preparation, and presents, to the best of management's knowledge and belief at the time of preparation, the expected course of action and the expected future risk adjusted financial performance of each such party."  These two statements, both individually and collectively, were false or misleading because, as set forth above, ***Defendants knew*** that the Jaguar Projections ***did not*** in fact reflect "the best currently available estimates and judgments of the management of Jaguar as to the future operating and financial performance of Jaguar," and ***did not*** in fact present "the expected course of action and the expected future risk adjusted financial performance" of Jaguar.  Defendants knew these two statements were false or misleading, because they knew that the Jaguar Projections treated Equilevia as a prescription product subject to a lengthy and expensive FDA approval process, when in fact, the plan was to market and sell Equilevia as a non-prescription product focused towards the Middle East market beginning in 2017.

SECOND AMENDED CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*The Omitted Cash Flow Projections, Pro Forma Projections, and Cash Flow Contribution Margins Were Necessary in Order to Make the Summaries of Stifel's Valuation Analyses and the Companies' Projections Not Incomplete and Misleading*

61.     As set forth above, the Proxy also omitted three categories of material projections and valuation metrics: (i) the Cash Flow Projections for both Jaguar and Napo; (ii) the Cash Flow Contribution Margins that the conflicted banker Stifel observed in connection with its Contribution Margin Analysis that it purportedly determined were "not meaningful" and Defendants elected to excise from the Proxy; and (iii) the Pro-Forma Projections for the Combined Company on a forward-looking basis (*see* Proxy at 276).  The omission of these three categories of information rendered the pages of the Proxy "summarizing" Stifel's Discounted Cash Flow and Contribution Margin Analyses (Proxy at 285-87) and the summaries of both companies' projections on pages 289-90 of the Proxy misleadingly incomplete because, without the omitted projections and contribution margins, shareholders were unable to fully recognize the illegitimacy of Stifel's analyses and were unable to fairly and properly assess the future financial prospects of Jaguar, Napo and the Combined Company.

62.     The Proxy itself notes that "summarizing" valuation analyses rather than providing a "complete description" of such analyses is inherently misleading.  As the Proxy notes, "[t]he summary text describing each financial analysis does not constitute a complete description of Stifel's financial analyses, including the methodologies and assumptions underlying the analyses, and if viewed in isolation could create a misleading or incomplete view of the financial analyses performed by Stifel."  Proxy at 279.  Yet the Defendants essentially asked Jaguar shareholders to "view" the summaries of Stifel's analyses isolated from the "complete descriptions" they needed to properly understand the analyses.  The federal securities laws do not allow corporate actors to evade liability by simply warning shareholders "what you're about to read is inherently misleading because it's an incomplete summary."  Rather than giving incomplete and misleading summaries of Stifel's valuation analyses, the Defendants were obligated to ensure that the Proxy provided complete and accurate descriptions of Stifel's valuation analyses and Jaguar's and Napo's projections, but they failed to do so.

SECOND AMENDED CLASS ACTION COMPLAINT

63.     First, the Proxy omitted the Cash Flow Projections for both Jaguar and Napo.  As stated in the Proxy, to perform its Discounted Cash Flow Analysis of Jaguar, Stifel utilized projections for Jaguar's unlevered free cash flow through calendar year 2026, which were provided by or prepared based upon direct input from Jaguar management.  Proxy at 286.  And to perform its Discounted Cash Flow Analysis of Napo, Stifel utilized projections for Napo's unlevered free cash flow through calendar year 2026, which were provided by or prepared based upon direct input from Jaguar management.  Proxy at 285.  It is indisputable that the Cash Flow Projections were the most important input in Stifel's Discounted Cash Flow Analyses—the entire analyses are based upon discounting the Cash Flow Projections to present value.  However, Defendants elected to exclude the Cash Flow Projections from the Proxy, despite the fact that they simultaneously elected to include a purported "summary" of Stifel's Discounted Cash Flow Analyses and both companies' projections.

64.     The Defendants' rationale for hiding the Cash Flow Projections from Jaguar's shareholders is clear—they did not want Jaguar's shareholders to recognize and comprehend how off-base Stifel's Discounted Cash Flow Analysis and the resulting implied equity values and implied ownership ratios were, and that the implied equity value for Jaguar set forth on page 286 of the Proxy was unreasonably manipulated lower than the actual inherent value of Jaguar.

65.     Stifel applied unreasonably high discount rates and unreasonably low perpetuity growth rates in connection with its Discounted Cash Flow Analysis of Jaguar.  *See* Proxy at 286.  Indeed, while Stifel discounted Jaguar's Cash Flow Projections to present value utilizing discount ranges from 16.5% - 21.5% purportedly "based on Jaguar's weighted average cost of capital," *id.*, as the below screen-shot illustrates, Bloomberg's estimate of Jaguar's weighted-average cost of capital in the first quarter of 2017 was 8.1%, significantly *below* the discount rate range Stifel utilized, and the higher the discount rate, the lower the resulting implied valuation becomes:

SECOND AMENDED CLASS ACTION COMPLAINT

Screen Printed

| JAGX US Equity | 1) Create Report | 2) Output to Excel | Weighted Average Cost of Capital |
| --- | --- | --- | --- |

Jaguar Health Inc                 Period  Q1 ▾ 2017

**Cost of Capital**

| | Weight | Cost | W x C |
| --- | --- | --- | --- |
| 3) Equity | 80.6% | 9.5% | 7.7% |
| 4) Debt Cost (A-T) | 19.4% | 2.3% | 0.5% |
| 5) Preferred Equity | 0.0% | 0.0% | 0.0% |
| WACC | | | 8.1% |

**Capital Structure (Millions of USD)**

| | | |
| --- | --- | --- |
| Market Cap | 14.4 | 80.6% |
| ST Debt | 2.1 | 12.0% |
| LT Debt | 1.3 | 7.4% |
| Pref. Eqty | 0.0 | 0.0% |
| Total | 17.9 | 100.0% |

**6) History**
☑ WACC ☐ EVA ☐ ROIC ☐ EVA Spread

**Economic Value Added (Millions of USD)**

| | |
| --- | --- |
| 7) Net Operating Profit | -13.78 |
| 8) Cash Operating Taxes | 0.00 |
| NOPAT | -13.78 |
| 9) Total Investment Capital | -2.71 |
| Capital Charge | -0.22 |
| Economic Value Added | -13.56 |
| ROIC | 507.57% |
| EVA Spread | 499.45% |

SN 613446 CDT  GMT-5:00 H189-5681-3 09-Oct-2018 15:30:43

66.     Furthermore, while Stifel "calculated the terminal value of the projected unlevered free cash flow by applying a range of perpetuity growth rates of 1% to 3%, as specified by Jaguar management," that growth rate was unreasonably low.  Indeed, the rate is significantly lower than the year-to-year growth in Jaguar's pretax income, which was significantly higher than 1% to 3% and ranged from 8% to 213%[4].  *See* Proxy at 289.   Thus, by hiding the Jaguar Cash Flow Projections and simultaneously purporting to "summarize" Stifel's Discounted Cash Flow Analysis that utilized unreasonably high discount rates and unreasonably low growth rates, the "summary" of the Discounted Cash Flow Analysis misled Jaguar shareholders about the value of their shares.  Jaguar shareholders were impeded from recognizing that Stifel misvalued their shares utilizing a flawed and unreasonable analysis, and were misled about the implied equity value for Jaguar, because the Jaguar Cash Flow Projections were hidden from them.  If the Jaguar Cash Flow Projections had been disclosed, Jaguar shareholders would have been able to determine that the implied equity value of their Jaguar shares was higher than the $48 to $96 million range set

---

[4] These numbers were arrived at by adjusting the Jaguar income projections on page 289 of the Proxy for milestone payments.  Because milestone payments occur in some years and not others, removing such payments provides a more meaningful year-to-year comparison to assess Jaguar's growth trend.

SECOND AMENDED CLASS ACTION COMPLAINT

1  forth on page 286 of the Proxy.  Without the actual Cash Flow Projections, all Jaguar shareholders

2  were given was a misleading conclusion that the implied equity value for Jaguar was significantly

3  lower than Jaguar's actual intrinsic value.

4       67.    Additionally, even if the Proxy accurately summarized the discount rate range, the

5  growth rate, and the implied equity value for Jaguar that Stifel utilized and arrived at in connection

6  with its Discounted Cash Flow Analysis, the summary was nevertheless misleading because it

7  presented an unreasonable valuation picture of the Company.  The Individual Defendants, as

8  officers and directors of Jaguar, were required to critically review Stifel's valuation analyses in

9  connection with their receipt of Stifel's fairness opinion and question Stifel as to its derivation of

10 fairness.  And they knew or should have known that Stifel's analysis and the resulting valuation

11 was flawed and unreasonably low, because they knew or should have known that the discount rate

12 Stifel utilized was unreasonably high given Jaguar's actual weighted-average cost of capital, and

13 that the growth rate Stifel applied was unreasonably low given management's projected growth

14 for other metrics.  Nevertheless, the Defendants elected to summarize Stifel's flawed and

15 unreasonable Discounted Cash Flow Analysis in the Proxy, which misled Jaguar shareholders

16 about the value of the Company and their shares.  Corporate officers and directors cannot turn a

17 blind eye to a financial advisor's patently unreasonable valuation analysis and elect to

18 "summarize" such an analysis in a proxy statement, because such an analysis will mislead

19 shareholders regarding the value of their shares.  This is particularly true when the "summary" of

20 the analysis omits the key projections that would enable shareholders to recognize just how off-

21 base the banker's valuation actually was, *i.e.*, the Cash Flow Projections.

22      68.    The omission of both the Cash Flow Projections and the purportedly "not

23 meaningful" Cash Flow Contribution Margins also rendered the summary of Stifel's Contribution

24 Margin Analysis on page 287 of the Proxy incomplete and misleading.  The Contribution Margin

25 Analysis provided unlevered free cash flow contribution margin percentages for Jaguar and Napo

26 for years 2022 through 2026, *but failed to disclose and denoted as "NM", i.e., "not meaningful",*

27 *the contribution margin percentages for years 2017 through 2021.* What was found to be "not

28 meaningful" about the cash flow contribution margin percentages for these years? The Proxy does

SECOND AMENDED CLASS ACTION COMPLAINT

1   not say.  Defendants have asserted that for those years, Stifel's analysis indicated that the projected

2   *difference* between Jaguar's and Napo's expected contribution after the Merger was not

3   meaningful.  The Proxy does not explain what "*difference*" in cash flow contributions Stifel

4   deemed to be "not meaningful."   However, based upon the projections included in the Proxy for

5   net income, it appears that the contribution differences Stifel purportedly deemed "not meaningful"

6   ***were actually quite significant***.   For example, for 2019, Jaguar's net income was projected to be

7   $1.8 million, while Napo's net income was projected to be *negative* $20.3 million.  Proxy at 289-

8   90.  That is far from a "not meaningful" difference, yet it was denoted as "not meaningful" in the

9   "Net Income" line of the table on page 287.  Thus, on information and belief, including based upon

10  the contribution margin differences for net income that were denoted as "not meaningful" despite

11  the fact that they differed significantly, and the fact that Defendants withheld the Cash Flow

12  Projections from the Proxy, it appears that the summary of Stifel's Contribution Margin Analysis

13  excised and denoted as "not meaningful" both Net Income and Free Cash Flow Contribution

14  Margins that were in fact meaningful to Jaguar's shareholders because they showed that Jaguar

15  was more valuable than accounted for in the Transaction.   And while shareholders could calculate

16  the contribution margins for net income because the net income projections for both companies

17  were included in the Proxy, they could not calculate the contribution margins for unlevered free

18  cash flow, because the Cash Flow Projections were omitted from the Proxy.

19          69.      Furthermore, Defendants elected to summarize the projections for both companies

20  on pages 289-90 of the Proxy, but they excised and failed to disclose the most important

21  projections—the Free Cash Flow Projections.  The omission of the Free Cash Flow Projections

22  rendered the projection tables on pages 289-90 of the Proxy incomplete and misleading because,

23  without the Cash Flow Projections, the projection summaries provided a misleading overall

24  valuation picture of both companies.  This is because there are significant differences between

25  unlevered free cash flow projections, which are widely recognized as the most important valuation

26  metric when it comes to valuing a company and its stock, and the projections that were included

27  in the Proxy for revenue, profit, income, and EBITDA.

28

30

SECOND AMENDED CLASS ACTION COMPLAINT

70.     The disclosed primary projection metrics (revenue, profit, income, and EBITDA) *are not sufficient analogs for cash flow projections*. Well settled principles of corporate finance and valuation dictate that the value of companies and their stock she be premised upon the company's projected future cash flows, not projected revenue, profit, income or EBITDA.

71.     First, there are fundamental differences between unlevered free cash flow and revenue.  Revenue is simply a top line accounting of what a company earns from the sale of goods or services related to the company's primary operations. It never accounts for any expenses or costs.  Unlevered free cash flows, meanwhile, track the actual cash in hand and the cash that flows in and out of the company—cash that enables a company to settle debts, reinvest in its business, return money to shareholders, pay expenses, and provide a buffer against future financial challenges. "The critical importance of cash flow lies in the ability of a company to remain functional; it must always have sufficient cash to meet short-term financial obligations."[5] Revenue should also be understood as a one-way inflow of money into a company, while cash flow represents inflows and outflows of cash.  Cash flow also differs from revenue in that is not accrued.  Furthermore, gross profit is simply an interim line item between revenues and net income, calculated by subtracting the cost of goods sold from revenue.   Thus, gross profit is also meaningfully different from unlevered free cash flow.

72.     Next, there are fundamental differences between unlevered free cash flow and net income. A company's net income is a quite arbitrary figure obtained after assuming certain accounting hypotheses regarding expenses and revenues. On the other hand, free cash flow is an objective measure, a single figure that is not subject to any personal criterion.[6] As Professor Fernández further explains:

---

[5] J.B. Maverick, *How are cash flow and revenue different?*, Investopedia (July 19, 2018), https://www.investopedia.com/ask/answers/011315/what-difference-between-cash-flow-and-revenue.asp.

[6] Pablo Fernández, *Cash flow is a Fact. Net income is just an opinion*, (October 17, 2008), http://csinvesting.org/wp-content/uploads/2015/02/Cash-Flow-vs.-NI.pdf, also found as *Valuation Methods and Shareholder Value Creation*, Chapter 9 Cash Flow and Net Income, 2002 Academic Press, San Diego, CA.

SECOND AMENDED CLASS ACTION COMPLAINT

The classic definition of net income (revenues for a period less the expenses that enabled these revenues to be obtained during that period), in spite of its conceptual simplicity, is based on a series of premises that seek to identify which expenses were necessary to obtain these revenues. This is not always a simple task and often implies accepting a number of assumptions. Issues such as the scheduling of expense accruals, the treatment of depreciation, calculating the product's cost, allowances for bad debts, etc., seek to identify in the best possible manner the quantity of resources that it was necessary to sacrifice in order to obtain the revenues. Although this "indicator", once we have accepted the premises used, can give us adequate information about how a company is doing, the figure obtained for the net income is often used without full knowledge of these hypotheses, which often leads to confusion.

"Free cash flow is accurate because it shows the cash coming in and the cash going out whereas with net income, one has to worry about accrual accounting, non-cash charges such as depreciation and most importantly, heavy manipulation. The main advantage that free cash flow has over earnings is that it can't be manipulated as much."[7]  Simply stated, net income is an accounting number used for reporting purposes, but free cash flow is the actual amount of cash available to investors.

73.     Finally, there are fundamental differences between unlevered free cash flow and EBITDA.  EBITDA is not a sufficient alternative to unlevered free cash flows – as Warren Buffet and other financial experts have stated: "References to EBITDA make us shudder.  Too many investors focus on earnings before interest, taxes, depreciation, and amortization.  That makes sense, only if you think capital expenditures are funded by the tooth fairy."[8]  Relying solely on EBITDA to provide a fair summary of a company's financial prospects has numerous pitfalls.  EBITDA does not take into account any capital expenditures, working capital requirements, current debt payments, taxes, or other fixed costs that are critical to understand a company's value.[9]  As a result of these material differences between EBITDA and unlevered free cash flows, experts recognize unlevered free cash flows as a much more accurate measure when it comes to analyzing the expected performance of a company.

---

[7] David Thomas, *Why Free Cash Flow Is Better Than Earnings*, Shares and Stockmarkets, (July 29, 2013), https://sharesandstockmarkets.com/free-cash-flow-v-earnings/.

[8]     Elizabeth   MacDonald,   *the   Ebitda   folly*,   FORBES   (March   17,   2003), http://www.forbes.com/global/2003/0317/024.html.

[9]  Cody Boyte, *Why EBITDA is Not Cash Flow*, AXIAL FORUM (Nov. 19, 2013), http://www.axial.net/forum/ebitda-cash-flow/

32

74.     In light of these significant differences between free cash flow on the one hand, and the projected metrics that Defendants elected to disclose in the Proxy—revenue, profit, income, and EBITDA—the tables of projections on pages 289-90 of the Proxy were materially incomplete and misleading because, by failing to include the Cash Flow Projections, the tables provide a materially incomplete and misleading overall valuation picture of both companies.  Simply put, unlevered free cash flow projections are irreplaceable when it comes to fully, fairly and properly understanding a company's projections and value.

75.     Lastly, while the Defendants elected to include specific information regarding the pro forma combined condensed financial statements and balance sheets of Jaguar and Napo as if the Transaction had occurred on March 31, 2017 or January 1, 2016, Proxy at 316-323, Defendants inexplicably allowed the Proxy to omit the Pro-Forma Projections for Jaguar and Napo giving effect to the Transaction on a *forward-looking* basis.  *See* Proxy at 276.  Defendants, by electing to disclose information regarding the pro forma financials of Jaguar and Napo on a *historical-looking* basis, assumed on obligation to disclose the Pro Forma Projections, which would have informed Jaguar shareholders regarding one of the most important issues relevant to their decision—what Jaguar management expected the *Combined Company's projections* to look-like *going forward*, after the consummation of the Transaction.

76.     In sum, the Proxy contained statements which, at the time and in the light of the circumstances under which they were made, were materially false or misleading with respect to Jaguar's value, business plans, and financial prospects.  Further, while the Defendants elected to discuss both companies' projections in the Proxy and the valuation analyses performed by Stifel in support of its fairness opinion, the Proxy omitted the Cash Flow Projections, the Cash Flow Contribution Margins for 2017-2021, and the Pro Forma Projections, which rendered the summaries of Stifel's Discounted Cash Flow Analysis and Contribution Margin Analysis and the summaries of both companies' projections materially incomplete and misleading, for the reasons set forth in detail above.

SECOND AMENDED CLASS ACTION COMPLAINT

**C.**    **Plaintiff and the Class Suffered Financial Loss as a Result of the Unfair Transaction, Which Could Not Have Been Consummated Without the False and Misleading Proxy**

77.    The Merger Consideration undervalued Jaguar, and was the result of a severely flawed strategic review process, during which the Board made no meaningful effort to merge Jaguar with any party except Napo.  In early April 2016, the Board decided to engage Stifel for the sole purpose of evaluating the Transaction with Napo, and declined to orchestrate any formal sales process or market check.  The failure to even attempt to gauge the market value for Jaguar and other available strategic alternatives for the Company, the flawed negotiation process with Napo, and the materially misleading Proxy that led to the unfair Transaction caused Jaguar shareholders to suffer financial loss.

78.    Once negotiations began with Napo, the Board declined to explore other alternatives and focused on the vesting of their restricted stock units and protecting their directorships—not to maximize the value obtained for Jaguar's public shareholders.  After initially offering a merger of equals, the Board ultimately agreed to a 3-to-1 contribution ratio in favor of Napo, to clear Napo's debt by offering Napo debt holders Jaguar equity, and to sponsor a $3 million cash injection into Napo.  In exchange, the Jaguar Board maintained all of the board seats in the Combined Company.

79.    After the announcement of the deal on March 31, 2017, Jaguar's stock price severely dropped, losing nearly all of its value, as reflected in the chart below:

SECOND AMENDED CLASS ACTION COMPLAINT

80.     The stock went from nearly $1.00 per share at the time of the deal announcement to $0.12 per share on January 8, 2018.  This evaporation of value is a clear indication that Jaguar shareholders suffered damages as a result of the Transaction, and that the market agreed that Plaintiff's and the Class's shares were undervalued in the Transaction.

81.     The Board needed Jaguar shareholder approval to consummate the Transaction.  To achieve this, they disseminated the materially incomplete and misleading Proxy to shareholders on July 7, 2017.  Thus, the Proxy was an essential link in completing the Transaction.

82.     In sum, the false and misleading Proxy was an essential link in accomplishing the Transaction, which undervalued Jaguar shareholders' shares and caused Plaintiff and the Class to suffer financial loss in that they did not retain a fair equity stake in the post-Transaction Combined Company.

## CLASS ACTION ALLEGATIONS

83.     Plaintiff brings this action on his own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all holders of Jaguar common stock who were harmed by Defendants' actions described below (the "Class").  Excluded from the Class are

1 Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated
2 with any of the Defendants.

3     84.    This action is properly maintainable as a class action for the following reasons:

4     (a)    The Class is so numerous that joinder of all members is impracticable.  As
5 of June 30, 2017, Jaguar had approximately 17.38 million shares outstanding, held by hundreds to
6 thousands of individuals and entities scattered throughout the country.  The actual number of
7 public stockholders of Jaguar will be ascertained through discovery.

8     (b)    There are questions of law and fact which are common to the Class and
9 which predominate over questions affecting individual Class members.  The common questions
10 include, *inter alia*, the following:

11     i.    Whether Defendants have violated Section 14(a) of the Exchange
12     act and Rule 14a-9 promulgated thereunder;

13     ii.    Whether the Individual Defendants have violated Section 20(a) of
14     the Exchange Act; and

15     iii.    Whether stockholders suffered damages as a result of being
16     compelled to vote for the Transaction based on the materially false,
17     incomplete, and misleading Proxy.

18     (c)    Plaintiff is an adequate representative of the Class, has retained competent
19 counsel experienced in litigation of this nature, and will fairly and adequately protect the interests
20 of the Class;

21     (d)    Plaintiff's claims are typical of the claims of the other members of the Class
22 and Plaintiff does not have any interests adverse to the Class;

23     (e)    The prosecution of separate actions by individual members of the Class
24 would create a risk of inconsistent or varying adjudications with respect to individual members of
25 the Class which would establish incompatible standards of conduct for the party opposing the
26 Class; and

27
28

SECOND AMENDED CLASS ACTION COMPLAINT

(f)     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

(g)     A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## COUNT I

**On Behalf of Plaintiff and the Class Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder**

85.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

86.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

87.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Proxy communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

88.     Furthermore, when corporate actors voluntarily elect to speak regarding projections and valuation-related information, they assume an obligation to do so in a complete and accurate manner.  When it comes to disclosing projections and valuation information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose incomplete half-truths.  If one speaks on a topic, he is bound not only to state the truth but also not

SECOND AMENDED CLASS ACTION COMPLAINT

to suppress or conceal any facts within his knowledge which will materially qualify those stated; if he speaks at all, he must make a full and fair disclosure.  This is because the selective disclosure of projections and valuation information is inherently misleading, because, by providing only a partial "summary" of projections or valuation analyses, shareholders are unable to properly assess the overall valuation picture of a company or transaction.  Disclosing only a subset of available financial information, while withholding another subset of distinct financial information that changes the overall valuation picture created by the disclosed numbers, is misleading.

89.     Defendants issued the Proxy with the intention of soliciting shareholder support for the Transaction.  Each of the Defendants reviewed and authorized the dissemination of the Proxy and the use of their name in the Proxy.

90.     In so doing, Defendants made untrue statements of fact and omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, as officers and/or directors of Jaguar, were aware of the materially false and misleading statements in the Proxy and of the material information that was omitted from the Proxy, but failed to remedy these disclose deficiencies, in violation of Section 14(a) and Rule 14a-9.  The Individual Defendants were therefore negligent.

91.     Defendants knew or were negligent in not knowing that the Proxy was materially misleading and omitted material facts that were necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Transaction.  Indeed, the Proxy states that Defendants were privy to and had knowledge of the financial projections for both companies and the details surrounding discussions with other interested parties and Stifel.  Defendants knew or were negligent in not knowing that the material information identified above was omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.  Indeed, the Individual Defendants were required to review the Stifel's analyses in connection with their receipt of the fairness opinions, question Stifel as to their derivation of fairness, and be particularly attentive to the procedures followed in preparing the

SECOND AMENDED CLASS ACTION COMPLAINT

Proxy and review it carefully before it was disseminated, to corroborate that there were no material misstatements or omissions.

92.    Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  Defendants were negligent in allowing the Proxy to contain false and misleading statements and choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully.  Indeed, Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the review of both companies' financial projections.

93.    The misrepresentations, falsehoods, and omissions in the Proxy were material to Plaintiff and the Class, who were deprived of their right to cast an informed vote because such misrepresentations and omissions were not corrected prior to the shareholder vote on the Transaction.

94.    As a direct and proximate result of the dissemination of the false and/or misleading Proxy Defendants used to obtain stockholder approval of the Transaction, Plaintiff and the Class have suffered damages and actual economic losses (*i.e.* the difference between the value they received as a result of the Transaction and the true value of their shares prior to the Transaction) in an amount to be determined at trial.  By reason of the misconduct detailed herein, Defendants are liable pursuant to 14(a) of the Exchange Act and SEC Rule 14a-9.

## COUNT II
**On Behalf of Plaintiff and the Class Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

95.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

96.    The Individual Defendants acted as controlling persons of Jaguar within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as directors and/or officers of Jaguar, and participation in and/or awareness of the Jaguar's operations

and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of Jaguar, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete, false and misleading.

97.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

98.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of Jaguar, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The omitted information identified above was reviewed by the Board prior to voting on the Transaction.  The Proxy at issue contains the unanimous recommendation of the Board to approve the Transaction.  The Individual Defendants were thus directly involved in the making of the Proxy.

99.     In addition, as the Proxy sets forth, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

100.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

101.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class have suffered damages and actual

SECOND AMENDED CLASS ACTION COMPLAINT

economic losses (*i.e.* the difference between the value they received as a result of the Transaction and the true value of their shares prior to the Transaction) in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.  Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.  Awarding Plaintiff and the Class compensatory and/or rescissory damages sustained as a result of Defendants' wrongdoing, including, but not limited to, pre-judgment and post-judgment interest;

C.  Awarding Plaintiff and the Class the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

D.  Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity, and the federal statutory provisions sued hereunder; and

E.  Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED:  October 10, 2018

Respectfully submitted,

**OF COUNSEL**
**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
Miles D. Schreiner
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, New York 10118
Tel:  212-971-1341
Fax:  212-202-7880
Email: jmonteverde@monteverdelaw.com
         mschreiner@monteverdelaw.com

*Counsel for Lead Plaintiff and*
*Lead Counsel for the Putative Class*

*/s/ David E. Bower*
David E. Bower SBN 119546
**MONTEVERDE & ASSOCIATES PC**
600 Corporate Pointe, Suite 1170
Culver City, CA 90230
Tel: (213) 446-6652
Fax: (212) 202-7880
Email:  dbower@monteverdelaw.com

*Counsel for Lead Plaintiff and Lead*
*Counsel for the Putative Class*

41

SECOND AMENDED CLASS ACTION COMPLAINT

1

**CERTIFICATE OF SERVICE**

2          I hereby certify that on October 10, 2018, I electronically filed the foregoing document

3   with the Clerk of the Court using the CM/ECF system which I am informed and believe sent

4   notification of such filing to counsel of record in this Action.

5

6                              By:        */s/ David E. Bower*
                                          David E. Bower

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED CLASS ACTION COMPLAINT